# No. 21–17016

IN THE

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE: PACIFIC FERTILITY CENTER LITIGATION

**A.B., et al.,**
*Plaintiffs-Appellees,*

*v.*

**CHART INC.,**
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
JACQUELINE SCOTT CORLEY, DISTRICT JUDGE • CASE NO. 3:18-CV-01586-JSC

# APPELLANT'S OPENING BRIEF

**HORVITZ & LEVY LLP**
FREDERIC D. COHEN
STEPHEN E. NORRIS
PEDER K. BATALDEN
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**SWANSON, MARTIN & BELL, LLP**
JOHN J. DUFFY
KEVIN M. RINGEL
MARGARET C. REDSHAW
330 NORTH WABASH, SUITE 3300
CHICAGO, ILLINOIS 60611
(312) 321-9100

**ZENERE COWDEN
& STODDARD APC**
MARC G. COWDEN
ADAM STODDARD
2005 DE LA CRUZ BOULEVARD, SUITE 240
SANTA CLARA, CALIFORNIA 95050
(408) 430-3551

ATTORNEYS FOR DEFENDANT-APPELLANT
**CHART INC.**

# DISCLOSURE STATEMENT

Chart Inc. is a wholly owned subsidiary of Chart Industries, Inc.

(NYSE: GTLS).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iiv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF ISSUES PRESENTED .............................................. 5

STATEMENT OF THE CASE ............................................................... 7

    A.    PFC, a reproductive lab, purchases Chart-manufactured cryogenic tanks for storing reproductive tissue. ............................................................... 7

    B.    PFC disables Tank 4's controller in February 2018 after a false alarm. ................................................. 9

    C.    Tank 4 loses all of its liquid. ................................. 11

    D.    The College of American Pathologists places PFC on probation. ............................................................ 13

    E.    Following the accident, PFC alters data entries. ................ 13

    F.    PFC's customers pursue arbitration against PFC and lawsuits against Chart. ..................................... 15

    G.    At trial, the district court excludes a test by Chart's expert designed to disprove a key premise of Plaintiffs' product defect theory. ................................... 16

    H.    The jury returns a verdict for Plaintiffs and the district court denies posttrial relief. ................................. 19

SUMMARY OF THE ARGUMENT ....................................................... 20

i

ARGUMENT ........................................................................ 23

I.    The emotional distress damage award should be stricken
      because California law does not authorize Plaintiffs' recovery
      of emotional distress damages. ..................................... 23

      A.    Standard of review ................................................ 23

      B.    The California Supreme Court strictly limits recovery
            of emotional distress damages. ............................... 24

      C.    The California Supreme Court has limited parents'
            recovery of emotional distress damages when a child or
            fetus is injured.  These limits preclude recovery for
            injuries to eggs or embryos. ................................... 26

            1.    Cases limiting the right of parents to recover
                  emotional distress damages sustained as a result
                  of injuries to a child are analogous. ...................... 26

            2.    The California Supreme Court has likewise
                  limited recovery of emotional distress damages
                  for injuries to a fetus. ..................................... 31

            3.    The limitations imposed by the California
                  Supreme Court on recovery of emotional distress
                  damages for injuries to a child or fetus preclude
                  Plaintiffs' recovery of emotional distress damages
                  here. .......................................................... 33

      D.    Plaintiffs may not recover emotional distress damages
            by analogy to property damage cases. ...................... 36

            1.    With rare exceptions, emotional distress damages
                  are not recoverable for damage to property. .............. 36

            2.    The property damage cases do not support
                  Plaintiffs' recovery of emotional distress
                  damages. ...................................................... 39

E.      Application of the *Rowland* factors is not required here, but if the factors were to be applied, they too confirm that Chart should not be held liable. ..................................... 45

F.      Chart's argument is preserved for appeal. ........................... 49

II.      The district court erred in excluding Dr. Miller's test. ................ 52

A.      Standard of review ................................................. 52

B.      A district court should admit expert testimony if its methodology is scientifically valid. ....................................... 52

C.      Experts sometimes testify about their experiments. Two distinct types are admissible—accident simulations and illustrations of scientific principles. .......... 53

D.      The district court misunderstood that Dr. Miller's test was an illustration, rather than a simulation. That led the court to apply the wrong legal standard in excluding Dr. Miller's test, an abuse of discretion. ............. 56

1.      Dr. Miller employed proper scientific methods. .......... 56

2.      The district court's reasons for excluding Dr. Miller's test do not withstand scrutiny. ................ 59

E.      Excluding Dr. Miller's test was prejudicial. .......................... 65

III.      The district court erroneously excluded evidence that PFC allowed the level of liquid nitrogen in Tank 4 to run low. ........... 68

A.      Chart offered (but the court excluded) evidence that PFC had previously let liquid levels run low. ...................... 68

B.      Excluding the evidence was a prejudicial abuse of discretion. ................................................. 70

CONCLUSION ................................................. 72

STATEMENT OF RELATED CASES ................................. 73

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baxter v. Superior Ct.,*
19 Cal.3d 461 (1977) ................................................................. 34

*Bouley v. Long Beach Mem. Med. Ctr.,*
127 Cal.App.4th 601 (2005) .................................................. 34

*Brown v. USA Taekwondo,*
11 Cal.5th 204 (2021) ...................................................... 45, 46

*Burgess v. Superior Ct.,*
2 Cal.4th 1064 (1992) ....................................................... *passim*

*Champeau v. Fruehauf Corp.,*
814 F.2d 1271 (8th Cir. 1987) .............................................. 55

*Christensen v. Superior Ct.,*
54 Cal.3d 868 (1991) ................................................ 38, 39, 42, 43

*Claar v. Burlington N. R.R. Co.,*
29 F.3d 499 (9th Cir. 1994) .................................................. 58

*Cooper v. Superior Ct.,*
153 Cal.App.3d 1008 (1984) .................................................. 39

*Crawford v. City of Bakersfield,*
944 F.3d 1070 (9th Cir. 2019) .............................................. 67

*Crisci v. Sec. Ins. Co.,*
66 Cal.2d 425 (1967) .......................................................... 44

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. ___, No. 20-219, 2022 WL 1243658
(Apr. 28, 2022)................................................................... 30

*Daubert v. Merrell Dow Pharmaceuticals Inc.,*
509 U.S. 579 (1993) ...................................................... *passim*

iv

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995).............................................................58

*Dilworth v. General Electric Co.*,
    No. 08cv432, 2008 WL 11337013 (S.D. Cal. July 16, 2008)...............44

*Dorn v. Burlington N. Santa Fe R.R. Co.*,
    397 F.3d 1183 (9th Cir. 2005)...........................................................70

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)...........................................................58

*Erlich v. Menezes*,
    21 Cal.4th 543 (1999).............................................................. *passim*

*Fortman v. Förvaltningsbolaget Insulan AB*,
    212 Cal.App.4th 830 (2013) ...............................................................25

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................................52

*Gilbert v. Cosco Inc.*,
    989 F.2d 399 (10th Cir. 1993)...........................................................53

*Gruenberg v. Aetna Ins. Co.*,
    9 Cal.3d 566 (1973) ...........................................................................44

*Gu v. BMW of N. Am., LLC*,
    132 Cal.App.4th 195 (2005) .................................. 23, 25, 46, 47, 48, 49

*Huggins v. Longs Drug Stores Cal., Inc.*,
    6 Cal.4th 124 (1993)................................................................ *passim*

*In re E.R. Fegert, Inc.*,
    887 F.2d 955 (9th Cir. 1989)...........................................................49

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010)...........................................................51

*In re Pac. Fertility Ctr. Litig.*,
    814 F.App'x 206 (9th Cir. 2020)......................................................15

*Jodoin v. Toyota Motor Corp.*,
    284 F.3d 272 (1st Cir. 2002) ............................................. 53, 54, 59, 62

*Justus v. Atchison*,
    19 Cal.3d 564 (1977) ................................................................ *passim*

*Kately v. Wilkinson*,
    148 Cal.App.3d 576 (1983) ................................................................ 25

*Koon v. United States*,
    518 U.S. 81 (1996) ................................................................ 52

*Krouse v. Graham*,
    19 Cal.3d 59 (1977) ................................................................ 34

*Lever Bros. Co. v. Atlas Assur. Co.*,
    131 F.2d 770 (7th Cir. 1942) ................................................................ 61

*Levy v. Only Cremations for Pets*,
    57 Cal.App.5th 203 (2020) ....................................................... 39, 42, 43

*Lubner v. City of Los Angeles*,
    45 Cal.App.4th 525 (1996) ................................................................ 39

*McKnight ex rel. Ludwig v. Johnson Controls, Inc.*,
    36 F.3d 1396 (8th Cir. 1994) ................................................................ 53

*Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*,
    48 Cal.3d 583 (1989) ....................................................... 28, 30, 35

*McMahon v. Craig*,
    176 Cal.App.4th 1502 (2009) ................................................................ 38

*Molien v. Kaiser Found. Hosps.*,
    27 Cal.3d 916 (1980) ................................................................ 27

*Nachtsheim v. Beech Aircraft Corp.*,
    847 F.2d 1261 (7th Cir. 1988) ................................................................ 55

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ................................................................ 65

*Ochoa v. Superior Ct.*,
   39 Cal.3d 159 (1985) ................................................................ *passim*

*Pandit v. Am. Honda Motor Co.*,
   82 F.3d 376 (10th Cir. 1996)......................................................54, 59

*Paulsen v. CNF Inc.*,
   559 F.3d 1061 (9th Cir. 2009)............................................................23

*Potter v. Firestone Tire & Rubber Co.*,
   6 Cal.4th 965 (1993)............................................. 23, 24, 25, 36, 37, 40

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010)...............................................................53

*Ross v. Forest Lawn Mem. Park*,
   153 Cal.App.3d 988 (1984)..................................................................38

*Rovid v. Graco Children's Prod. Inc.*,
   No. 17-CV-01506-PJH, 2018 WL 5906075
   (N.D. Cal. Nov. 9, 2018) .........................................................62, 64, 65

*Rowland v. Christian*,
   69 Cal.2d 108 (1968) ......................................................45, 46, 47, 49

*Scantlin v. Gen. Elec. Co.*,
   510 F.App'x 543 (9th Cir. 2013)..........................................................53

*Schwarz v. Regents of Univ. of Cal.*,
   226 Cal.App.3d 149 (1990)..................................................................30

*Shabali v. City of Fontana*,
   11 Cal.5th 842 (2021).........................................................................31

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
   370 U.S. 19 (1962)..............................................................................50

*Thing v. La Chusa*,
   48 Cal.3d 644 (1989) ......................................................24, 25, 26, 27

*United States v. $11,500.00 in U.S. Currency*,
   869 F.3d 1062 (9th Cir. 2017)...........................................................50

vii

*United States v. Alatorre,*
    222 F.3d 1098 (9th Cir. 2000) ............................................................. 52

*United States v. Smith,*
    869 F.2d 348 (7th Cir. 1989) ...................................................... 63, 64

*United Steel v. Shell Oil Co.,*
    602 F.3d 1087 (9th Cir. 2010) ............................................................. 4

*Voohries-Larson v. Cessna Aircraft Co.,*
    177 F.R.D. 462 (D. Ariz. 1998) ................................................... 54, 55

*Wei Zhang v. Am. Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) ........................................................... 50

*Windeler v. Scheers Jewelers,*
    8 Cal.App.3d 844 (1970) ............................................................. 38, 43

*Wynn v. Monterey Club,*
    111 Cal.App.3d 789 (1980) ............................................................... 37

## Statutes

28 U.S.C. § 1291 ....................................................................................... 4

28 U.S.C. § 1294(1) .................................................................................. 4

28 U.S.C. § 1332(d) .................................................................................. 4

28 U.S.C. § 2107(a) .................................................................................. 4

## Rules

Fed. R. App. P. 4(a) .................................................................................. 4

Fed. R. Civ. P. 54(b) ................................................................................. 4

Fed. R. Evid. 607 ................................................................................. 5, 70

Fed. R. Evid. 702 ................................................................. 5, 6, 52, 53

9th Cir. R. 28–2.7 ..................................................................................... 5

viii

**Miscellaneous**

Fed. R. Evid. 702, Advisory Committee Notes
  to 2000 amendment ............................................................... 53

# APPELLANT'S OPENING BRIEF

## INTRODUCTION

Plaintiffs stored embryos and eggs with Pacific Fertility Clinic "PFC" in a cryogenic tank made by Chart. The tissues were destroyed, either because, as Plaintiffs contend, the tank lost its vacuum when a weld in the tank broke, or because, as Chart contends, PFC failed to maintain the correct level of liquid nitrogen in the tank. Plaintiffs sued Chart on products liability claims while separately arbitrating claims against PFC. At trial, a jury awarded Plaintiffs more than $13.5 million and apportioned Chart 90% fault and PFC 10% fault. That result is deeply flawed and must be remedied by way of this appeal.

Most of the verdict represents emotional distress damages that are not recoverable here. Under California law, emotional distress damages are available to plaintiffs who *themselves* are physically injured by a defendant's conduct but are generally unavailable where the plaintiff seeks compensation for physical injury *to others* unless the plaintiffs witnessed an injury to a family member or were direct victims of the defendant's alleged misconduct. Plaintiffs were neither

1

bystanders nor direct victims and thus may not recover emotional distress damages based on damage to their eggs or embryos.

California law would likewise bar emotional distress damages if the embryos and eggs are treated as property rather than potential living beings. No case has affirmed emotional distress damages resulting from property damage under circumstances similar to those in the present case. Because Plaintiffs cannot recover emotional distress damages as a matter of law, the judgment should be reduced to eliminate them.

The damages verdict is only one part of the problem, however. The other problem is that the jury allocated disproportionate fault to Chart due to two evidentiary errors made by the district court.

First, the court excluded a test performed by Chart's expert, Dr. Frank Miller, by applying the wrong standard—one that applies to accident recreations. Chart offered Dr. Miller's testimony in response to testimony by Plaintiffs' expert who hypothesized that a weld on the tank broke and, as a result, more than 120 liters of liquid nitrogen evaporated in twenty-two hours. Dr. Miller's experiment did not attempt to recreate the accident—he was testing a physical principle of

liquid nitrogen, in particular, whether it could evaporate that quickly. The admissibility of such a test hinges on a different standard the district court never considered. Dr. Miller's test would have undermined the key premise in Plaintiffs' theory of how the accident occurred. Armed with Dr. Miller's test, the jury would likely have concluded that PFC employees failed to monitor the tank and would have allocated greater fault to PFC.

That error was compounded when the court excluded evidence that PFC employees had previously allowed liquid nitrogen levels in the tank to fall too low—the very cause of the accident posited by Chart. PFC's witnesses were allowed to testify this had never occurred. Chart's contrary documentary evidence was excluded, marring Chart's defense.

These errors led the jury to view PFC more favorably than Chart. Accordingly, in addition to striking the emotional distress damages awards, this Court should reverse the judgment and remand for a new trial on whether Chart is liable for Plaintiffs' loss (and, if necessary, allocation and damages issues).

# JURISDICTIONAL STATEMENT

Plaintiffs pleaded class action allegations and invoked jurisdiction under the Class Action Fairness Act "CAFA", 28 U.S.C. § 1332(d). (2-ER-288–89; 2-ER-331.) No party disputed that the main CAFA elements were satisfied—more than 100 plaintiffs, more than $5 million at stake, and minimal diversity—and no party argued a CAFA exception applies. The district court denied class certification (2-ER-270–71), but that did not divest jurisdiction under CAFA. *See United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1089 (9th Cir. 2010).

The district court entered a Fed. R. Civ. P. 54(b) judgment for Plaintiffs following a jury trial (1-ER-34) and subsequently denied Chart's timely posttrial motions on November 8, 2021. (1-ER-2.) Chart timely filed a notice of appeal on December 1, 2021. (3-ER-539.) This Court has jurisdiction under 28 U.S.C. §§ 1291, 1294(1), and 2107(a), and Fed. R. App. P. 4(a).

## STATEMENT OF ISSUES PRESENTED

1.     Does California law authorize recovery of emotional distress damages for the destruction of Plaintiffs' cryogenically stored eggs and embryos?

2.     Chart's expert performed a test to demonstrate basic scientific principles, not to recreate the accident. Did the district court misapply Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), in excluding that test?

3.     Chart's expert testified the accident occurred because PFC's employees neglected to keep the tank full.  Did the district court err in excluding evidence that PFC had allowed the tank to run dry on prior occasions?

\* \* \*

Chart supplies the following citations under Circuit Rule 28–2.7:

Any party, including the party that called the witness, may attack the witness's credibility.

Fed. R. Evid. 607.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

5

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

# STATEMENT OF THE CASE

### A. PFC, a reproductive lab, purchases Chart-manufactured cryogenic tanks for storing reproductive tissue.

PFC is a reproductive lab that stores eggs and embryos in cryogenic tanks manufactured by Chart. (3-ER-372.) Cryogenic tanks maintain very low temperatures and can be used to store human tissue. (2-ER-343–44; 3-ER-473.) The tanks (called freezers, or dewars, for their inventor) resemble stainless steel thermoses. (3-ER-494.) An inner vessel holds tissue and liquid nitrogen; an outer vessel, or sleeve, surrounds the inner vessel; and a vacuum is created between the vessels. (2-ER-116; 2-ER-141; 2-ER-343–45.) Because heat and cold cannot pass through a vacuum, the inner vessel maintains a steady temperature. (2-ER-141–42; 2-ER-344–45; 3-ER-370.) A substance is added to the bottom of the vacuum layer of the tank to absorb stray molecules that migrate into the vacuum. (2-ER-142–43; 2-ER-147; 3-ER-509.)

Human cells are placed in small containers and immersed in liquid nitrogen, which has a temperature of –196 degrees centigrade. (3-ER-473; 3-ER-494.) The vacuum between inner and outer vessels

ensures the liquid nitrogen does not warm up and evaporate. (*See* 2-ER-141; 2-ER-343; 3-ER-370.)

A tank typically holds 120–150 liters of liquid nitrogen. (3-ER-517.) Due to normal lab activity (removing the lid to add or remove samples), about 5–10 liters evaporate each day. (2-ER-124; 3-ER-398; *see* 2-ER-346 (tanks fitted with Styrofoam lids to allow gas to evaporate); 3-ER-458; 3-ER-498.)

Two steps taken by Chart help PFC keep tanks full.

First, Chart attached a twenty-six-inch fill tube to each tank. (2-ER-345.) One end connects to an external source of liquid nitrogen; another end is inserted into the bottom of the tank through the vacuum layer and welded to the inside of the inner vessel wall. (2-ER-112; 2-ER-148; 2-ER-345.)

Second, Chart incorporated a supplier's computerized controller, the TEC 3000, to monitor liquid levels. (2-ER-90.) When the liquid drops below a level set by the user, the controller automatically opens a valve, allowing liquid nitrogen to flow into the dewar from a supply tank. (3-ER-370; 3-ER-372; 3-ER-386; 3-ER-496.) The controller also monitors temperature levels, calculates the evaporation rate, and

8

sounds an alarm if the temperature rises above a specified degree. (2-ER-119–21; 2-ER-145; 2-ER-236–37; 3-ER-370–71; 3-ER-377–428; 3-ER-495–96.)  In addition, the controller automatically contacts key lab personnel by phone to warn about dangerous conditions.  (3-ER-444–45.)  When connected to a laptop, the controller can download a log of temperatures, liquid levels, and alarm codes.  (2-ER-119–20; 3-RT-496; *see* 3-RT-371; 3-ER-434.)

Under PFC's quality control plan, each tank must be connected to an alarm system that alerts lab personnel if the level of liquid nitrogen falls below four inches.  (3-ER-372; 3-ER-413–14; 3-ER-444; 3-ER-480.)  Embryologists must check the liquid level every day and add liquid manually if needed.  (*See* 3-ER-410.)

## B.  PFC disables Tank 4's controller in February 2018 after a false alarm.

In 2018, PFC was storing two eggs for Plaintiff A.S. (3-ER-474), eighteen eggs for Plaintiff R.E. (3-ER-475), four embryos for Plaintiff L.P. and her husband (3-ER-476), and nine eggs for Plaintiff C.P. (3-ER-477).  All were stored in Tank 4, which PFC purchased in January 2012. (2-ER-364–65.)

9

On February 15, 2018, an alarm sounded on Tank 4 indicating that liquid nitrogen in the tank had run low. (3-ER-426; 3-ER-428–29.) When lab personnel checked the tank, however, it had the correct level of liquid. (3-ER-429.) Dr. Joseph Conaghan, the lab's director, concluded the controller had malfunctioned and was incapable of measuring the correct liquid level or turning off its automatic fill feature once the tank was full. (3-ER-376; 3-ER-416; 3-ER-425–26; 3-ER-428.)

Customers had previously contacted Chart employees with similar controller issues. (2-ER-120–23.) When customers reported problems, Chart technicians instructed them to reboot the controller, restoring it to factory settings, or to insulate it from outside electrical interference. (2-ER-121; 2-ER-128–30; 2-ER-132–33.) Alternatively, Chart replaced the controller without charge. (*See* 2-ER-130.)

PFC did not inform Chart that its controller had stopped working. (3-ER-439.) Nor did PFC transfer the contents to a backup tank with a working controller (3-ER-385 (cells transferred to backup tank only after Tank 4 failed); 3-ER-436–38), even though a backup tank was available for this purpose, nor did it obtain a replacement controller or alarm system (3-ER-413; 3-ER-446–50).

10

Dr. Conaghan simply unplugged the controller. (3-ER-429; 3-ER-375–76.)  In place of the controller's automatic functions, he instructed embryologists to manually measure the liquid level in Tank 4 with a yardstick at the end of each day and record their measurements.  (3-ER-433; 3-ER-440; 3-ER-462; 3-ER-497.)  If the level was too low, they were to add liquid manually by turning the controller back on. (3-ER-430–31; 3-ER-440; 3-ER-462–63.)  Embryologists sometimes poured liquid nitrogen into the tank with buckets from leftover uses. (3-ER-469.)

### C.    Tank 4 loses all of its liquid.

By Saturday, March 3, 2018, Tank 4 had been operating without a controller for sixteen days.  Jean Popwell, an embryologist, reported filling the tank to fourteen inches that afternoon.  (3-ER-411.)

The next day, Dr. Conaghan and colleagues were working in the lab.  (3-ER-373.)  Around noon, twenty-two hours after Popwell filled the tank (3-ER-516), Dr. Conaghan tried to open Tank 4's lid to check the liquid-nitrogen level, but the metal around the lid was deformed and the lid was stuck.  (3-ER-376–77; 3-ER-391; 3-ER-464–65.)  Popwell finally opened the lid; inside, the tank was practically empty and the

11

liquid level was lower than the boxes inside. (3-ER-378–79; *but see* 3-ER-466 (Popwell thought there were still four to five inches of liquid in the tank).) Dr. Conaghan did not see condensation on the outside of Tank 4, but noticed "a little water on the floor" around it. (3-ER-380.)

Hoping to preserve tissues, Dr. Conaghan turned the controller on to refill the tank while other employees retrieved the backup tank from another floor. (3-ER-384–85.) In less than an hour, they filled the backup tank with liquid nitrogen, and after another hour, they transferred tissues to the backup tank. (3-ER-388.) But by then, Plaintiffs contend, the reproductive tissue had been compromised. (3-ER-472.)

Two days later, after having been allowed to warm to room temperature, the empty Tank 4 imploded. (2-ER-362–63 (tank was not fully imploded on March 4); 3-ER-506–08 (same); 3-ER-515 (tank fully collapsed on March 5 or 6); 3-ER-531 (picture of collapsed tank).)

A week later, PFC emailed Plaintiffs that their eggs and embryos might have been impacted. (*See* 3-ER-537.)

12

**D.** **The College of American Pathologists places PFC on probation.**

PFC is accredited to operate a reproductive lab by the College of American Pathologists "CAP". (3-ER-369; *see* 3-ER-450.) Following the accident, CAP sent two inspectors to review PFC's procedures. (3-ER-454.) CAP concluded PFC was violating standards that "focus[ ] on the quality management of the laboratory," particularly the training of staff to monitor and maintain storage tanks. (3-ER-533.) CAP placed PFC on "probation with immediate jeopardy." (3-ER-533.) The probation remained in effect for nine months until the conditions that led to probation had been rectified. (3-ER-457; 3-ER-533.)

**E.** **Following the accident, PFC alters data entries.**

Chart later discovered that some of PFC's end-of-day measurements (after Dr. Conaghan unplugged the controller) were not contemporaneously recorded.

Two weeks after the incident, PFC embryologist Gina Cirimele changed several data entries:

13

She amended a February 8 comment, "Low on liquid nitrogen" (3-ER-536; *see* 3-ER-519), to read "Low on liquid nitrogen. Fill tomorrow when restocked on LN2." (3-ER-536; *see* 3-ER-519).

She entered the value 12 (the liquid nitrogen level in Tank 4) in a blank that had been left on February 15. (3-ER-521.)

She amended a February 15 comment, "Low level showing in tank 4" (3-ER-520; 3-ER-536), to read "Low level showing in Tank 4 – manually measured." (3-ER-536; *see* 3-ER-520.)

On February 28, 2018, Cirimele initialized an entry, but entered no data, leaving the level blank. (3-ER-521; 3-ER-536.) On March 19, 2018, Cirimele changed a blank entry to a data entry of 12.3, purportedly the level on February 28, 2018. (3-ER-521; 3-ER-536.)

When CAP put PFC on probation, it was not aware of these alterations. (3-ER-453.) Dr. Conaghan testified that a lab can be closed for backdating data. (3-ER-451.)

14

**F.    PFC's customers pursue arbitration against PFC and lawsuits against Chart.**

S.M., who was storing her cells at PFC, filed a putative class action against PFC on behalf of other individuals who stored frozen eggs and embryos at PFC.  (2-ER-330–41.)  The action was later consolidated with two other actions and labeled as the *In re Pacific Fertility Litigation*.  (2-ER-297.)

In a second amended class action complaint, Plaintiffs alleged multiple claims against PFC, including fraudulent concealment and gross negligence.  (2-ER-284; 2-ER-286–87.)

Plaintiffs later added Prelude Fertility, Inc. (which acquired PFC), and Chart.  (2-ER-318.)  Against Chart, Plaintiffs asserted product liability claims for failure to warn, manufacturing and design defects, and negligent failure to recall the tank.  (2-ER-289–93; 2-ER-319–20.)

The claims against the PFC-related defendants were compelled to arbitration.  *In re Pac. Fertility Ctr. Litig.*, 814 F.App'x 206 (9th Cir. 2020).  As to the remaining defendant, Chart, the district court denied class certification and commenced a bellwether trial as to the five Plaintiffs here.  (2-ER-270; *see* 2-ER-282.)

15

### G.    At trial, the district court excludes a test by Chart's expert designed to disprove a key premise of Plaintiffs' product defect theory.

The parties' experts disputed the cause of the tank failure, and the outcome at trial turned on which expert the jury believed.  As the district court observed, "causation . . . is the crux of the whole case." (2-ER-232.)

According to Dr. Anand Kasbekar, Plaintiffs' expert, when PFC added liquid nitrogen through the fill tube, the cold liquid caused the tube to contract, increasing pressure on the weld attaching the tube to the tank's interior.  (2-ER-349–50; 2-ER-353–54; 2-ER-360.)  On the evening of March 3, the weld gave way and created an opening through which liquid nitrogen entered the protective vacuum.  (2-ER-347.)  The liquid expanded in the vacuum and caused the tank to implode.  (2-ER-347–48; 2-ER-355–57.)  In the twenty-two hours between when the lab closed on March 3 and when Dr. Conaghan examined the tank on March 4, all of the liquid evaporated, leaving the tank empty and the tissues exposed.  (2-ER-358; 4-ER-378–79.)

Chart's expert, Dr. Frank Miller, disagreed.  Dr. Miller, who has a doctorate in mechanical engineering with a specialty in cryogenics (3-ER-484–87), testified it was physically impossible for 122 liters of liquid nitrogen in the tank to evaporate in twenty-two hours. (2-ER-170.)  If liquid nitrogen had leaked into the vacuum, it would have turned into a gas and expanded to 700 times its volume as a liquid, exerting pressure on the inner chamber and preventing more liquid from escaping.  (2-ER-251; 3-ER-502–03.)  In effect, the gas would have plugged the leak.  (3-ER-502–03.)

Dr. Miller concluded the accident was not caused by a sudden leak; instead, lab personnel failed to maintain the tank and allowed it to run dry over several days.  (3-ER-499; 3-ER-512.)  After Dr. Conaghan emptied the tank, the tank heated to room temperature and nitrogen gas previously absorbed at the bottom of the tank evaporated into the vacuum space between the inner and outer tanks; the buildup of that gas pressure caused the implosion.  (3-ER-501; 3-ER-509–11; 3-ER-515.)

To demonstrate the scientific impossibility of Plaintiffs' theory that 122 liters of liquid nitrogen could evaporate in twenty-two hours, Dr. Miller performed an experiment.  He filled one of Chart's tanks with liquid nitrogen and added gas to the vacuum layer, destroying the vacuum and with it the tank's insulation.  (2-ER-211–12; 2-ER-254.) Without insulation, the liquid nitrogen heated to room temperature and began evaporating.  (2-ER-247.)  After twenty-two hours, four inches of liquid nitrogen remained, sufficient to cover tissues stored in the tank. (2-ER-259.)  After twenty-seven hours, five hours longer than Tank 4 was unattended,  almost two inches of liquid remained in the tank. (2-ER-259.)

Plaintiffs moved to exclude Dr. Miller's test as not sufficiently similar to the accident here.  (2-ER-240 (citing *Daubert*, 509 U.S. at 591).)  The court granted Plaintiffs' motion.  (2-ER-227–29.)

The court also granted Plaintiffs' motion to bar evidence that, in 2013 and 2014, PFC had allowed Tank 4 to run dangerously low on liquid nitrogen.  (2-ER-156; 2-ER-224–25.)  The court ruled those events were too remote in time.  (2-ER-224–25.)

### H.    The jury returns a verdict for Plaintiffs and the district court denies posttrial relief.

The jury found Chart liable on three product liability theories: (i) manufacturing defect, (ii) the consumer expectation test, and (iii) the risk benefit test.  (1-ER-35–39.)  It also found Chart negligent because it had not recalled the controller.  (1-ER-40.)  The jury allocated 10% fault to PFC and 90% fault to Chart.  (1-ER-44.)

Over Chart's objection, the district court had instructed the jury that it could award emotional distress damages to Plaintiffs on each of the claims just mentioned.  *See infra* Part I.E.  The jury awarded four Plaintiffs $100,000 in economic damages, and the fifth $75,000; it awarded emotional distress damages of $3.5 million for two Plaintiffs, $3 million for another, $2.5 million for another, and $2 million for the fifth.  (1-ER-42–43.)

The court denied Chart's motions for new trial and judgment as a matter of law.  (1-ER-2.)

## SUMMARY OF THE ARGUMENT

1.      *California law does not authorize recovery of emotional distress damages here.*  Emotional distress damages are generally not available to plaintiffs unless they suffer physical injuries.  Where a parent seeks recovery of emotional distress damages based on injury to a child or fetus, the California Supreme Court permits such recovery only if that parent was a bystander who witnessed the injury or was a direct victim injured along with the child or fetus.  Neither of these legal theories permits Plaintiffs to recover here.  Whether damage to embryos and eggs is analogized to harm to one's child or to one's fetus, California Supreme Court precedent bars Plaintiffs' recovery of emotional distress damages.

Another line of cases discusses when emotional distress damages can be recovered for loss of property, but those cases are not relevant.  Eggs and embryos are living cells and the pertinent authorities are those discussing the circumstances in which a parent may recover emotional distress based on injuries to children or to a fetus.  But the result is in any event no different if the eggs and embryos are deemed property.  Under California law, emotional distress damages are

recoverable for injury to property only where the defendant's conduct concurrently threatened the plaintiff with physical injury, or where the defendant breached an express or implied promise to ensure the plaintiff's emotional well-being. Here, Chart did neither.

2. *Excluding Dr. Miller's tank test was reversible error.* To admit a scientific test designed to simulate or reconstruct an accident, an expert must show substantial similarity between the experiment and the accident. But a test designed to demonstrate background scientific principles need not meet that substantial similarity standard. It is admissible as long as the test was properly conducted.

This case involves the latter. Chart's expert, Dr. Miller, designed a test illustrating a background principle of physics—how quickly liquid nitrogen evaporates when an insulating vacuum of a cryogenic tank is suddenly removed. The district court excluded the test because it was dissimilar to the accident—Dr. Miller's tank was empty, while Tank 4 contained boxes of genetic material, and Dr. Miller breached the vacuum differently than what occurred during the accident. But Dr. Miller was not trying to simulate the accident, he was illustrating physical characteristics of liquid nitrogen. And Chart submitted

evidence that neither the presence of boxes in a tank nor the manner in which a vacuum is compromised affects the evaporation rate.

The court applied the wrong legal rule (requiring substantial similarity) in excluding Dr. Miller's test, and that error made a difference. If Dr. Miller had testified about his test results, the jury would likely have rejected Plaintiffs' theory (that Tank 4's liquid nitrogen ran out in just twenty-two hours) and concluded the tank ran dry because PFC employees neglected to keep it full, either relieving Chart of responsibility or attributing additional fault to PFC.

3. *Excluding evidence that PFC employees let tank levels fall too low was reversible error*. The prejudice caused by excluding Dr. Miller's test was compounded when the court also excluded evidence that, on several past occasions, PFC had allowed Tank 4's liquid nitrogen levels to fall dangerously low. PFC's witnesses claimed this *had* never occurred and *could* never occur. Chart offered documentary evidence to the contrary, but the court excluded it. That powerful evidence would have impeached PFC's witnesses. Excluding it prejudiced Chart's defense and impacted the verdict.

22

# ARGUMENT

**I.     The emotional distress damage award should be stricken because California law does not authorize Plaintiffs' recovery of emotional distress damages.**

## A.     Standard of review

California courts analyze a particular plaintiff's eligibility to recover emotional distress damages as a question of duty.  *E.g., Huggins v. Longs Drug Stores Cal., Inc.*, 6 Cal.4th 124, 129 (1993); *Gu v. BMW of N. Am., LLC*, 132 Cal.App.4th 195, 200 (2005) ("[W]e conclude that BMW owed no duty to plaintiff that would allow her to recover for emotional distress . . . .").  And there is generally "no duty to avoid negligently causing emotional distress to another."  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984 (1993).  "The question of whether a duty of due care exists under California negligence law is a question of law that [this Court] review[s] de novo."  *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009).

**B.    The California Supreme Court strictly limits recovery of emotional distress damages.**

Defendants have a duty not to cause physical injury to another and thus may be held liable for emotional distress that is "parasitic" to the physical injury sustained by the plaintiff.  *See Potter*, 6 Cal.4th at 981.  In contrast, recovery is almost never permitted by plaintiffs who seek emotional distress damages for their reaction to physical injuries *to others*.  *See id*. at 985.  A plaintiff may recover emotional distress damages based on their reaction to another person's injury only where the plaintiff is a *bystander* to an injury sustained by a closely related family member or is a *direct victim* of the defendant's alleged injurious conduct.  *See Burgess v. Superior Ct.*, 2 Cal.4th 1064, 1073 (1992).

To recover as a bystander, the plaintiff must not only be closely related to the victim but must also be present at the scene of the injury-producing event, and contemporaneously aware of the victim's injury.  *Thing v. La Chusa*, 48 Cal.3d 644, 667–68 (1989).  To recover as a direct victim, the plaintiff must establish that the defendant owed a duty—either one imposed by law or assumed by the defendant—to ensure the plaintiff's emotional well-being, or had a special relationship with the

plaintiff that required the defendant to ensure the plaintiff's emotional well-being. *Burgess*, 2 Cal.4th at 1073.

Under all but the rarest circumstances, awards of emotional distress damages are likewise prohibited in cases alleging damage to property or financial interests. The only exceptions are for cases where the defendant's damage to the plaintiff's property threatened physical injury to the plaintiff, or where the defendant expressly undertook to ensure the plaintiff's emotional well-being. *See Potter*, 6 Cal.4th at 985; *Erlich v. Menezes*, 21 Cal.4th 543, 554 (1999) ("No California case has allowed recovery for emotional distress arising solely out of property damage." (citation omitted)).

These principles apply as well in products liability litigation, where liability for physical injuries is governed by the limitations of the bystander and direct-victim liability theories. *See Gu*, 132 Cal.App.4th at 203–10 (applying *Burgess*, *Potter*, and *Erlich* in denying car owner's request for emotional distress damages for sister's unseen death in products liability case); *accord Fortman v. Förvaltningsbolaget Insulan AB*, 212 Cal.App.4th 830, 841 (2013) ("*Thing*'s mandatory requirements apply in products cases without exception."); *Kately v. Wilkinson*,

148 Cal.App.3d 576, 580, 587–88 (1983) (holding that boat owner was

entitled to recover emotional distress damages from manufacturer on

bystander theory where water skier being towed by owner was injured

as a result of a design defect of the boat).

> **C.**    **The California Supreme Court has limited parents' recovery of emotional distress damages when a child or fetus is injured.  These limits preclude recovery for injuries to eggs or embryos.**
>
> > **1.**    **Cases limiting the right of parents to recover emotional distress damages sustained as a result of injuries to a child are analogous.**

In a series of cases that are directly analogous to the present case,

the California Supreme Court has limited parents' recovery of

emotional distress damages for injuries to children.  *See Burgess*,

2 Cal.4th at 1073.  Recovery of emotional distress damages in these

cases is the rare exception, not the general rule, whether plaintiffs

pursue a bystander or direct-victim theory.

In *Thing*, the supreme court addressed the *bystander* theory,

denying recovery to a mother whose child was injured by an automobile

where the mother "neither saw nor heard the accident."  48 Cal.3d at

647–48, 699.  Even though the child's mother "was nearby" and "rushed

to the scene where she saw her bloody and unconscious child, whom she

26

believed was dead, lying in the roadway," she was not permitted to recover emotional distress damages because she was not present at the scene when the accident occurred. *Id*.

Recovery under the *direct-victim theory* is limited to circumstances where the defendant owed a duty—whether assumed or imposed by law or because of a special relationship—to ensure the plaintiff's emotional well-being. *Burgess*, 2 Cal.4th at 1073; *Molien v. Kaiser Found. Hosps.*, 27 Cal.3d 916, 923 (1980) (holding that a doctor owed such a duty to the husband of a patient incorrectly diagnosed with syphilis whom he advised to receive testing and treatment), *limited on another ground by Burgess*, 2 Cal.4th at 1074. In several controlling cases, the California Supreme Court has precluded parental recovery of emotional distress damages on a direct-victim theory because the defendant did not jointly injure the parent and child. *Huggins*, 6 Cal.4th at 126, 131–32; *Ochoa v. Superior Ct.*, 39 Cal.3d 159, 172 (1985); *see Burgess*, 2 Cal.4th at 1078 & n.8. In these cases, the courts held the defendants had not impliedly or expressly assumed any duty to the parent. *See Huggins*, 6 Cal.4th at 126, 131–32; *Ochoa*, 39 Cal.3d at 172–73; *see also Burgess*, 2 Cal.4th at 1078 & n.8.

27

The California Supreme Court first imposed limits on parental direct-victim recovery in *Ochoa*. There, parents of a juvenile who died of pneumonia while incarcerated could not recover emotional distress damages. *Id.* at 163–64, 172. Although the parents witnessed the juvenile's decline in health during jail visits, they could not recover as direct victims because the defendants' conduct "was *directed primarily at the decedent*, with [the mother] looking on as a helpless bystander as the tragedy of her son's demise unfolded before her."[1] *Id.* at 172 (emphasis added).

In contrast to *Ochoa*, the mother in *Burgess* recovered emotional distress damages when her obstetrician injured her child during delivery. *Burgess*, 2 Cal.4th at 1075–76. Recovery was permitted because the obstetrician owed a duty of care to the mother *and* to the child: "any treatment for [the child] necessarily implicated [the mother's] participation since access to [the child] could only be accomplished with [the mother's] consent and with impact to her body." *Id.* at 1076; *accord Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*,

---

[1] The court in *Ochoa* separately held that, because the parents *witnessed* their son's demise firsthand, they could recover emotional distress damages on a bystander theory. *Id*. at 170–72.

48 Cal.3d 583, 592 (1989) (holding that psychotherapist who sexually abused children while counseling them and their parents regarding interfamily dispute was liable to parents on the direct-victim theory for emotional distress suffered by parents as a result of the abuse). The court contrasted the mother with the father, whom the Court noted could *not* recover on a direct-victim theory. *Burgess*, 2 Cal.4th at 1078 n.8. "[T]he physician-patient relationship critical to a mother's cause of action is almost always absent in a father's claim." *Id.*

Finally, in *Huggins*, the California Supreme Court squarely held that parents who are not under the care of a defendant health care provider may not recover on a direct-victim theory for injuries to their child. In *Huggins*, a pharmacist filled a prescription for the parents' two-month-old son and instructed the parents to administer too high a dose. 6 Cal.4th at 126. The parents sought emotional distress damages, but the supreme court rejected their direct-victim theory, explaining that "[w]hen the plaintiff is not the defendant's patient . . . '[c]ourts have not extended the . . . direct-victim cause of action to emotional distress which is derived solely from a reaction to another's injury.'" *Id.* at 131–32 (citation omitted). "[T]he end and aim of the

29

prescription dispensed by [the pharmacist] was to provide medical treatment for plaintiffs' infant son." *Id*. at 132.

*Huggins* further held that a preexisting contractual relationship between the parents and the pharmacy was not enough to give rise to a duty on the part of the pharmacy to ensure the plaintiffs' emotional well-being. *Id*. at 131 (citing *Schwarz v. Regents of Univ. of Cal.*, 226 Cal.App.3d 149, 168 (1990)) ("[T]he simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent."); *cf. Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. ___, No. 20-219, 2022 WL 1243658, at *8 (Apr. 28, 2022) ("[The view that emotional distress] damages are available where 'the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result,' . . . does not reflect the consensus rule among American jurisdictions. Far from it." (citation omitted)). *Huggins* distinguished *Burgess* and *Marlene F.* because the plaintiffs there were mothers who were "*patients* of the defendant caregivers." *Huggins*, 6 Cal.4th at 131–32.

> **2.      The California Supreme Court has likewise limited recovery of emotional distress damages for injuries to a fetus.**

The limitations above apply equally where plaintiffs claim emotional distress damages as a result of injury to a fetus.  *See Justus v. Atchison*, 19 Cal.3d 564, 582–85 (1977), *overruled on another ground by Shabali v. City of Fontana*, 11 Cal.5th 842 (2021) and *on a different ground by Ochoa*, 39 Cal.3d 159.  In *Justus*, an appeal involving two consolidated personal injury actions, each of which involved fetal stillbirth allegedly caused by defendants' negligence, the California Supreme Court held the husbands of the women who carried the fetuses could *not* recover emotional distress damages, even though the spouses were present in the delivery room at the time of the attempted delivery of the stillborn fetuses.  19 Cal.3d at 582–85.  The supreme court acknowledged each husband "witnessed certain disturbing developments in the delivery room, including expressions of concern by the medical staff and the use of emergency procedures," but pointed out that each husband's anxiety "did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive

spectator he had no way of knowing that the fetus had died." *Id.* at 585. As in bystander cases, because "the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact," neither husband could recover emotional distress damages. *Id.*

And in a passage rejecting an equal protection challenge, the supreme court cast doubt that parents could ever recover emotional distress damages for injuries sustained before their children are born: plaintiffs asserting a wrongful death claim based on loss of a fetus "have never known more than a mysterious presence dimly sensed by random movements in the womb," which distinguishes them from "the mother and father of a child born alive[, who] have seen, touched, and heard their baby." *Id.* at 581.

Although *Justus* did not specifically address the direct-victim theory, the supreme court's later decisions in *Burgess* and *Huggins* leave no doubt that theory would have failed. Because the plaintiff-father was not being treated by the defendant-physician at the time of the injury to the fetus, the father would not be entitled to recover on a direct-victim theory. It is only the "*patients* of the defendant caregivers"

who may claim to be "the defendants' direct victims." *Huggins*,

6 Cal.4th at 131–32.

> ### 3. The limitations imposed by the California Supreme Court on recovery of emotional distress damages for injuries to a child or fetus preclude Plaintiffs' recovery of emotional distress damages here.

Under the controlling principles set forth above, Plaintiffs cannot

recover emotional distress damages for the injuries to their eggs and

embryos. This result applies whether Plaintiffs' claims are analogized

to a claim by parents for injury to their child (as in *Huggins* or *Burgess*)

or for injury to a fetus (as in *Justus*).

Assuming Plaintiffs' claims are akin to those of a parent seeking

emotional distress for injury to a child, Plaintiffs' recovery is barred

because they cannot prevail on either a bystander or a direct-victim

theory. Plaintiffs were not bystanders under California law. They were

not present at PFC when their reproductive material was destroyed.

And they did not witness the destruction.

Nor can Plaintiffs recover on a direct-victim theory. The supreme court's decisions in *Huggins*, *Ochoa*, and *Burgess* confine such recovery to situations where defendants breached an independent duty to the parent. Nothing similar occurred here.

Denying emotional distress damages in this context is consistent with what would have happened if, instead of embryos, Plaintiffs had entrusted children to third parties and the children were fatally injured. For example, if a child sustained fatal injuries at a summer camp, the parent would have no claim under *Huggins*, *Ochoa*, or *Burgess* for emotional distress. The parent would have a wrongful death action, but parents may not recover emotional distress damages in a wrongful death action. *Krouse v. Graham*, 19 Cal.3d 59, 72 (1977); *Bouley v. Long Beach Mem. Med. Ctr.,* 127 Cal.App.4th 601, 610 (2005). Moreover, parents have no loss of consortium claim for the wrongful death of their children. *Baxter v. Superior Ct.*, 19 Cal.3d 461, 463, 465–66 (1977) (holding that parents had no loss of consortium claim against physician or hospital for negligent administration of anesthesia that reduced their sixteen-year-old child's cognitive level to that of a

three-year-old). Consequently, denial of emotional distress damages for injuries to an embryo is faithful to California negligence law.

That Plaintiffs characterize themselves as "patients" of the fertility clinic is not a basis for an award of emotional distress damages. Unlike the mother in *Burgess*, who was delivering her child at the time of its injury, and unlike the mothers in *Marlene F.*, who were being treated by the psychotherapist while he was sexually abusing their children, Plaintiffs were not being *medically treated* by PFC or Chart for infertility at the time of the accident here. Plaintiffs' eggs and embryos stored in the tank had long since been extracted from Plaintiffs' bodies. Plaintiffs may well have been traumatized by the thought that the embryos or eggs represented a chance to have children, but that trauma is no different in kind than the trauma sustained by the parents in *Ochoa, Burgess*, or *Huggins*.

Deeming the eggs and embryos as analogous to a fetus leads to the same result. Because a fetus is simply a more developed form of a human egg or embryo, the supreme court's decision in *Justus* forecloses an emotional distress recovery here as a matter of law. The fathers who provided sperm for the fetuses in *Justus* are no different from Plaintiffs

35

who provided sperm and eggs to create embryos here. Neither was present at the time of the accident (the attempted delivery of the stillborn fetus, or the PFC tank incident). Allowing emotional distress damages for harm to an egg or embryo that has been separated from the womb and stored in a tank, lacking any physical connection to the sperm and egg providers at the time of the injury, cannot be squared with California Supreme Court precedent.

### D. Plaintiffs may not recover emotional distress damages by analogy to property damage cases.

#### 1. With rare exceptions, emotional distress damages are not recoverable for damage to property.

Emotional distress damages are rarely available to a plaintiff suing for property damage. *Erlich*, 21 Cal.4th at 548, 554–55; *Potter*, 6 Cal.4th at 985. In the most recent California Supreme Court decision involving such a claim, *Erlich*, the court held the plaintiffs could not recover emotional distress damages from a defendant contractor based on their fear that construction defects would cause their home to collapse. 21 Cal.4th at 548–549, 555–56. The court acknowledged it was *foreseeable* that defective construction would cause

the plaintiffs emotional distress, but foreseeability alone could not justify recovery. *Id*. at 552.

*Erlich* distinguished *Potter*, 6 Cal.4th 965, which held that where defendants lived in fear for their safety because of the defendant's contamination of groundwater, the plaintiffs could recover emotional distress damages *if* they were ill at the time they asserted their claim or they were likely to develop cancer. *Id*. at 997. The plaintiffs in *Erlich* could not recover because, unlike the plaintiffs in *Potter*, "they could have avoided any threat of harm" by moving out of their house. *Erlich*, 21 Cal.4th at 556. Thus, "with rare exceptions," property damage warrants an award of emotional distress damages only where the injury threatens *the plaintiff* with "physical injury, not simply damage to property or financial interests." *Id*. at 555–56 (citation omitted).

In distinguishing other cases, *Erlich* noted that recovery has been permitted when "the express object of the contract is the mental and emotional well-being of one of the contracting parties." *Id*. at 559 (citing *Wynn v. Monterey Club,* 111 Cal.App.3d 789, 799–801 (1980)) (holding gambling clubs could be liable for emotional distress damages based on breach of agreement to exclude husband's gambling-addicted

37

wife from clubs and not to cash her checks); *Ross v. Forest Lawn Mem. Park*, 153 Cal.App.3d 988, 992–96 (1984) (allowing claim for emotional distress damages against mortuary for breach of agreement to keep burial service private and to protect grave from vandalism); *Windeler v. Scheers Jewelers,* 8 Cal.App.3d 844, 851–52 (1970) (holding bailee liable for loss of heirloom jewelry where jewelry's great sentimental value was made known to bailee); *accord Christensen v. Superior Ct.*, 54 Cal.3d 868, 890–91 (1991) (holding family members of a deceased person had standing to seek damages for emotional distress against mortuary that harvested organs without the family's consent and cremated several bodies together without preserving their integrity or identity; mortuary has "special relationship" with bereaved, requiring that it ensure their emotional well-being at time of their loss).

Numerous decisions follow the limitations imposed in *Erlich. See, e.g.*, *McMahon v. Craig*, 176 Cal.App.4th 1502, 1507, 1511 (2009) (holding veterinarian not liable for dog owner's emotional distress caused by veterinarian's breach of promise to ensure that dog did not aspirate water or food in hours following surgery, resulting in death of dog from pneumonia; "if the Supreme Court would not extend 'direct

victim' status to father of a child under a doctor's care, it assuredly would not extend it to the owner of a pet under a veterinarian's care"); *Lubner v. City of Los Angeles,* 45 Cal.App.4th 525, 527, 532–34 (1996) (holding emotional distress damages not available to plaintiffs for property damage to their home, including destruction of artwork, when defendant's vehicle crashed into their home); *Cooper v. Superior Ct.*, 153 Cal.App.3d 1008, 1012 (1984) (same); *cf. Levy v. Only Cremations for Pets*, 57 Cal.App.5th 203 (2020) (holding dog owner could recover emotional distress damages from a pet cremation service for negligent cremation because of the "special relationship" between the cremation service and the dog owner analogous to the mortuary's special relationship in *Christensen*).

> ## 2. The property damage cases do not support Plaintiffs' recovery of emotional distress damages.

In seeking emotional distress damages, Plaintiffs vacillated between two theories. On the one hand, they argued that they should be awarded emotional distress damages because their losses were akin to losing family members. (*See, e.g.,* 3-ER-527 ("[I]nvestment in IVF [is] not like buying a handbag or a car.").) On the other hand, in pretrial

briefing, they argued the alleged injury to their eggs and embryos sh*ould* be treated as property damage. "When, as here, a plaintiff has sustained substantial property damage, emotional distress damages may properly be awarded . . . ." (2-ER-173.) Cases involving injury to a child or fetus, such as *Ochoa*, *Huggins*, *Burgess*, and *Justus*, are the proper guides here, not cases involving the right to recover emotional distress damages based on injury to a plaintiff's property.

Even accepting Plaintiffs' characterization of the eggs and embryos as the equivalent of personal property, however, the controlling authorities are the California Supreme Court's decisions in *Erlich* and *Potter*, which preclude the recovery of emotional distress damages for property damages, absent a showing that the defendant's conduct physically injured the plaintiffs or threatened physical injury to them. Because Plaintiffs neither demonstrated physical injury nor a threat of physical injury, they may not recover emotional distress damages even if their eggs and embryos are deemed a form of personal property.

40

The California Supreme Court, as noted, also stated in dicta in *Erlich* that some courts have held a defendant who expressly agrees to ensure the plaintiff's emotional well-being may be liable to the plaintiff for emotional distress damages. But Chart cannot be liable on the theory that it undertook to ensure the emotional well-being of Plaintiffs. As a threshold matter, Chart had no contractual relationship with Plaintiffs. The only relevant contract is between PFC and Plaintiffs, and its purpose was to preserve reproductive material, not to safeguard Plaintiffs' emotional well-being.

Even if Chart had a direct contractual relationship with Plaintiffs, however, "the simple existence" of a contractual relationship of any kind between parents and a defendant providing care to the parent's offspring "is *not* in itself sufficient to impose on the caregiver a duty of care owed to the parent." *Huggins*, 6 Cal.4th at 131 (emphasis added). Like the pharmacist in *Huggins*, who had no duty to ensure "the emotional well-being of the [child] patient's parents," *id*. at 132, nothing about the relationship between Plaintiffs and Chart gave rise to a duty to ensure Plaintiffs' emotional well-being.

41

Indeed, to hold Chart liable for the damage to the eggs and embryos based on dicta from *Erlich*—which *denied* recovery to the plaintiffs based on property damage—would contravene supreme court decisions such as *Huggins* and *Justus*, which unequivocally preclude recovery of emotional distress damages for injuries to children or fetuses *unless* the plaintiff can prevail on a bystander or direct-victim liability theory. As demonstrated, Plaintiffs cannot recover on either of those theories. Their inability to do so precludes their recovery on the basis that the eggs and embryos are mere property.

The cases involving the mishandling of human remains, as in *Christensen*, or pet remains, as in *Levy*, are not to the contrary. In *Christensen*, the California Supreme Court specifically noted the "unique" nature of a claim brought by family members of a decedent against a mortuary, based on the mortuary's mishandling of the decedent's remains. As noted by the court, mortuaries assume a duty to ensure the emotional well-being of bereaved survivors of a decedent. *Christensen*, 54 Cal.3d at 895 ("[T]he provision of services related to the disposition of human remains has been distinguished because of the unique nature of the services"). In light of the unique nature of the

services provided, the courts in *Christensen* and *Levy* found that a special relationship arose under which the defendants were charged with ensuring the well-being of the bereaved plaintiffs, whether survivors or pet owners. *See id.*; *Levy*, 57 Cal.App.5th at 217–19. By contrast, Chart did not enter into a contract to provide emotional care to the Plaintiffs. (Whether PFC did so need not be resolved here.)

In any event, the supreme court's decisions in *Huggins*—that a plaintiff who is not the defendant's patient cannot recover emotional distress damages—and *Justus*—precluding an emotional distress award based on injury to a fetus—control over both *Christensen* and *Levy* if they are deemed inconsistent. *Huggins* was decided after *Christensen* and leaves no doubt that Plaintiffs may not recover for emotional distress damages for Chart's alleged injuries to their reproductive material. To the extent *Levy* might be construed to say anything to the contrary, *Huggins*, a supreme court decision, controls.

For similar reasons, authorities involving property of sentimental value, such as the heirloom jewelry in *Windeler*, are not controlling here. *Windeler* was decided in 1970, over two decades before the supreme court's decisions in *Burgess* (1992) and *Huggins* (1993). Those

43

supreme court decisions refused to extend "direct victim" status to the father of a child under a doctor's care; it would make no sense to extend that status to the owner of property with sentimental value.

In the trial court, Plaintiffs relied on *Dilworth v. General Electric Co.*, No. 08cv432, 2008 WL 11337013 (S.D. Cal. July 16, 2008). There, a manufacturer could seek emotional distress damages because the plaintiffs were present when a fire caused by the manufacturer's dishwasher damaged the plaintiffs' home. *Id.* at *3.

The court in *Dilworth* further concluded that the plaintiffs could seek emotional distress damages because of the property damage *to their home* caused by the fire. *Id.* at *2–3. In so ruling, the *Dilworth* court cited broad dicta from two insurance bad faith cases that permitted emotional distress damages on the insurer's breach of the implied covenant of good faith and fair dealing. *See id.* at *2 (citing first *Crisci v. Sec. Ins. Co.*, 66 Cal.2d 425, 433 (1967); then *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 579 (1973).

Plaintiffs here rely on *Dilworth's* citation to the insurance bad faith cases, but *Dilworth*'s reliance on those cases was misplaced. *Dilworth* failed to acknowledge that the supreme court in *Erlich*

44

specifically limited the holdings in those cases to the insurance context because of the unique relationship between insurers and their insureds that are not present in other commercial contracts. *See Erlich*, 21 Cal.4th at 552–53 ("In holding that a tort action is available for breach of the covenant in an insurance contract, we have 'emphasized the "special relationship" between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility.'" (citation omitted)). Because the covenant of good faith and fair dealing does not apply either to Plaintiffs' relationship with PFC or to PFC's relationship with Chart, the awards cannot be sustained based on the award of such damages in insurance bad faith cases.

### E. Application of the *Rowland* factors is not required here, but if the factors were to be applied, they too confirm that Chart should not be held liable.

In addressing duty issues, courts sometimes consult policy considerations first described in *Rowland v. Christian*, 69 Cal.2d 108 (1968), to determine whether to limit the scope of a legal duty that is otherwise owed. *See Brown v. USA Taekwondo*, 11 Cal.5th 204, 209 (2021). The multifactor test in *Rowland* "was not designed," however, "as a freestanding means of establishing duty, but instead as a means

45

for deciding whether to *limit* a duty derived from other sources."
*Id.* at 217 (emphasis added).

Here, as demonstrated, Chart owed Plaintiffs no duty to ensure their emotional well-being—whether the eggs and embryos are deemed the equivalent of children, fetuses, or property. Because Plaintiffs can establish neither bystander nor direct-victim theories, nor any other basis on which Chart owes a duty, there is no need to turn to the *Rowland* factors to determine whether its duty should be limited.

Even if the *Rowland* factors were considered, they do not support imposing a duty here, as reflected by similar cases. For example, in *Gu,* 132 Cal.App.4th at 199, a plaintiff sued BMW on a products liability theory, seeking emotional distress damages based on the distress she suffered when her sister was fatally injured while driving the plaintiff's BMW. The court *rejected* the plaintiff's contention that she was entitled to recover emotional distress damages based on the *Rowland* factors. *Id.* at 208. The court denied the relevance of *Rowland* as a threshold matter: "there is no duty to avoid negligently causing emotional distress to another." *Id.* at 208. The court nonetheless applied the *Rowland* factors to show the analysis would not aid the plaintiff. The court

46

explained BMW was not liable for emotional distress damages because:
(1) the foreseeability of injury, certainty of damage to the plaintiff, and
closeness of connection between the defendant's conduct and the injury
alone are not a sufficient basis for liability; (2) BMW was not morally
blameworthy simply because the vehicle's head protection system,
the alleged defective component, could have been better designed;
(3) BMW already had adequate incentives to produce safe vehicles
because drivers may recover emotional distress damages when
physically injured; and (4) allowing suits by family members for injuries
to their relatives who were not present at the injury-producing event
"would inevitably increase both insurance costs and the demands for
payment from the pool of available insurance funds." *Id.* at 209–10.

Here, as in *Gu*, the *Rowland* factors foreclose Plaintiffs' attempt to
recover emotional distress damages. First, the foreseeability of
Plaintiffs' injury, the certainty of their damage, and the connection
between Chart's conduct and their injury alone are not a sufficient basis
for imposing a duty. *See id.* at 210–11. Indeed, if foreseeability and
these related factors sufficed, the pharmacist in *Huggins* would have
been liable on a direct-victim theory for providing incorrect information

to the infant's parents, the obstetrician in *Burgess* would have likewise been liable on a direct-victim theory to *both* mother *and* father for injuring the umbilical cord, and the juvenile authorities in *Ochoa* would have been liable on a direct-victim theory for neglecting to care for the plaintiffs' incarcerated pneumonia-stricken child while he was in custody.  But these factors were *not* a sufficient basis for imposing a duty in any of those cases, nor are they here.

Second, Chart is not morally blameworthy.  Plaintiffs contend the cryogenic tank or the controller could have been designed differently, but that cannot be a basis for finding moral culpability. Chart is no more culpable than BMW in *Gu*, the pharmacist in *Huggins*, or the obstetrician in *Burgess*.  And it is far less culpable than the juvenile authorities in *Ochoa*.  Moreover, Chart already has a strong incentive to produce safe tanks because users may recover other types of damages, including economic damages, as reflected by the awards of $475,000 to Plaintiffs here.

48

Finally, allowing suits by family members for injuries to absent relatives "would inevitably increase both insurance costs and the demands for payment from the pool of available insurance funds." *Gu,* 132 Cal.App.4th at 210.

As the application of the *Rowland* factors further confirms Chart has no liability here, the awards of emotional distress damages should be stricken.

### F. Chart's argument is preserved for appeal.

Chart raised this issue in the district court by objecting that emotional distress damages were not recoverable on Plaintiffs' negligent failure to recall claim. (2-ER-176; 3-ER-524–25; *see* 2-ER-173.) The court overruled Chart's objection (3-ER-525), instructed the jury that Plaintiffs sought emotional distress damages (1-ER-77), and supplied a verdict form allowing those damages to be awarded (1-ER-42–43). That preserved the issue. *See In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (describing "[a] workable standard" for preservation: an issue "must be raised sufficiently for the trial court to rule on it").

49

Plaintiffs may respond that Chart did not *also* object to awarding emotional distress damages on the strict liability claims and may note that the jury awarded lump-sum emotional distress damages on (apparently) all claims. But this response should not prevent this Court's review for two reasons.

First, the lump-sum awards were general verdicts, *see Wei Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003), and under the general verdict rule, reversal is required if *any* error could have contributed to it, *e.g.*, *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30 (1962). This Court seeks to save general verdicts if the error did not influence the jury. *United States v. $11,500.00 in U.S. Currency*, 869 F.3d 1062, 1068 (9th Cir. 2017). But a saving construction is impossible here. The error—allowing Plaintiffs to recover emotional distress damages—applies to every theory of liability asserting harm to embryos and eggs. Chart's legal argument does not depend on the particular claims Plaintiffs pursued.

Second, the Court should in any event address this issue "because it is a pure question of law" that "is a recurring issue." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). Whether Plaintiffs are eligible to recover emotional distress damages is an issue of duty—a purely legal issue. *Supra* p. 23. And it is recurring for the more than one hundred additional PFC patients that have sued Chart in the district court and are awaiting trial. (*See* 4 ER 544–47.) Plaintiffs would not be prejudiced by this Court's consideration of the issue. Plaintiffs could not have sought emotional distress damages in some different way if only they had seen the argument here fully aired in the district court. This Court should therefore address this legal issue on its merits.

## II.   The district court erred in excluding Dr. Miller's test.

### A.   Standard of review

This Court reviews orders excluding evidence, including expert testimony, for an abuse of discretion.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).  "A district court by definition abuses its discretion when it makes an error of law."  *Koon v. United States*, 518 U.S. 81, 100 (1996).

### B.   A district court should admit expert testimony if its methodology is scientifically valid.

An expert witness may give an opinion on scientific or technical topics that will help the jury understand the issues at trial.  Fed. R. Evid. 702(a).  District courts must screen expert evidence to ensure it is reliable, *United States v. Alatorre*, 222 F.3d 1098, 1100–01 (9th Cir. 2000), which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 592–93.

52

A district court has discretion to assess reliability, but that discretion is not unlimited. Rule 702 "is not intended to serve as a replacement for the adversary system." *Scantlin v. Gen. Elec. Co.*, 510 F.App'x 543, 545 (9th Cir. 2013). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of" challenging expert testimony. *Daubert*, 509 U.S. at 596; *see Primiano*, 598 F.3d at 564 (same). "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's notes to 2000 amendment.

## C. Experts sometimes testify about their experiments. Two distinct types are admissible—accident simulations and illustrations of scientific principles.

Federal appellate courts observe a distinction between (1) simulations and recreations, and (2) tests and experiments that illustrate scientific principles. *E.g.*, *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 278–79 (1st Cir. 2002); *McKnight ex rel. Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1401 (8th Cir. 1994); *Gilbert v.*

*Cosco Inc.*, 989 F.2d 399, 402 (10th Cir. 1993). In the first category, "substantial similarity" must exist between the experiment and the accident. *Voohries-Larson v. Cessna Aircraft Co.*, 177 F.R.D. 462, 466 (D. Ariz. 1998) (citation omitted). But if the test illustrates a scientific phenomenon—the second category—"we simply inquire whether the test on which the evidence is premised was 'properly conducted.'" *Jodoin*, 284 F.3d at 278–79 (citation omitted).

The second category amounts to a "recognized exception" to the first category. *Pandit v. Am. Honda Motor Co.*, 82 F.3d 376, 381–82 (10th Cir. 1996). There is no reason to insist on replicating accident conditions "when the experiment merely illustrates principles used to form an expert opinion." *Id.*

Applying this distinction, the district court in *Voohries-Larson* admitted a test showing that the tank design on a Cessna aircraft was defective because fuel flowed out of the tank to the wingtip when the wingtip was low. *Voohries-Larson*, 177 F.R.D. at 466–68. Plaintiff's expert performed the test on a wing from which certain parts had been removed, and he simulated the G-forces of an uncoordinated turn similar to the accident by placing the wing at various angles. *Id.* at 466.

54

The defendant argued the test was misleading: "tilting a nonmoving wing does not duplicate the complex gravitational and centrifugal forces at work in a moving aircraft." *Id.* at 467. The court rejected that argument: the tests were offered "not to recreate the accident, but rather to demonstrate that under some circumstances the float valves will not function as intended." *Id.* at 468; *accord Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1277–78 (7th Cir. 1988) (affirming admission of video showing ice accumulation and removal by deicing equipment on the same model aircraft in accident); *Champeau v. Fruehauf Corp.*, 814 F.2d. 1271, 1278 (8th Cir. 1987) (affirming admission of experiment whose purpose "was not to recreate the accident, but to take Champeau's distance and speed estimates and show that under the applicable laws of physics the accident could not have occurred as Champeau had described").

**D.    The district court misunderstood that Dr. Miller's test was an illustration, rather than a simulation.  That led the court to apply the wrong legal standard in excluding Dr. Miller's test, an abuse of discretion.**

**1.    Dr. Miller employed proper scientific methods.**

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified."  *Daubert*, 509 U.S. at 593.  "[A] scientific explanation must be capable of empirical test."  *Id*.

Dr. Miller performed an experiment to try to falsify Plaintiffs' theory about how quickly liquid nitrogen evaporates.  He filled a tank with fourteen inches of liquid nitrogen, the amount PFC's records indicated was in the tank on the evening of March 3.  (2-ER-252.) He then eliminated or "spoiled" the vacuum insulating the tank.  (2-ER-211–12 ("[W]hen you put gas in there, it degrades the value of that insulation such that heat can get in there and warm things up or it boils away quicker."); 2-ER-252.)  Eliminating the vacuum is the standard method labs use to test how a loss of vacuum affects the contents of cryogenic tanks.  (2-ER-212.)  With the insulation removed, and the autofill feature of the controller disabled, Dr. Miller let the freezer sit; he photographed its appearance and recorded its outer surface temperature, the LN2 level shown on the controller, and the boiloff rate

calculated by the controller. (2-ER-252; 2-ER-254.) His photographs showed ice and steam appearing on the outside of the tank as the liquid nitrogen evaporated. (2-ER-253–59.) After eighteen hours, the critical time period when PFC's staff were not monitoring Tank 4, 5.2 inches of liquid remained in the tank, and a plume of gas was visible on top. (*See* 2-ER-258–59.) After twenty-two hours, four inches of liquid remained in the tank. (2-ER-259.)

Dr. Miller's test demonstrated two scientific facts pertinent to the jury's task: first, following a sudden loss of a vacuum, liquid nitrogen does not evaporate as quickly as Plaintiffs contended; second, if the accident had occurred as Plaintiffs' expert claimed, vapor plumes and ice would have been visible to PFC employees when they returned to the lab on the morning of March 4. PFC's employees did not see them. (3-ER-459–60.) Applying the scientific principles revealed by his test, Dr. Miller concluded the accident could not have been caused by a catastrophic loss of the vacuum, but must instead have been caused by PFC employees allowing Tank 4 to run dry.

Dr. Miller followed established scientific protocols, described each step of the experiment, and documented everything in writing and with photographs. (2-ER-252–59.) His procedure for testing the boiloff rate of liquid nitrogen can be repeated by other scientists. Thus, he "arrived at [his] conclusions using scientific methods and procedures, and [they] were not mere subjective beliefs or unsupported speculation." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (citing *Daubert*, 509 U.S. at 590); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

Virtually the same test procedures were followed by a group of scientists who published their results in the September 2019 edition of the Journal of Assisted Reproduction and Genetics, which Dr. Miller discussed in his declaration. (2-ER-167–69; 2-ER-199.) Dr. Miller's experiment thus comports with the "standards governing how scientists conduct their research and reach their conclusions," the test this Court applies for admitting expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

58

Because Dr. Miller was illustrating scientific principles (category 2), not simulating the accident (category 1), it is irrelevant that he did not attempt to duplicate the conditions in Tank 4 on the night before the accident. That was not his goal. (2-ER-215.) His experiment tested objective physical principles: how quickly liquid nitrogen would evaporate if the insulating vacuum surrounding a tank's inner vessel suddenly disappeared, and what the outside of the tank would have looked like during the evaporation process. It follows that Dr. Miller was "not required to adhere strictly to the conditions of the accident." *Pandit*, 82 F.3d at 381–82. He was required to establish only that the test was "properly conducted." *Jodoin*, 284 F.3d at 278–79 (citation omitted).

### 2. The district court's reasons for excluding Dr. Miller's test do not withstand scrutiny.

The district court gave three reasons for excluding Dr. Miller's test. The first was that the tank Dr. Miller used did not contain any of the boxes of biological samples that were present in Tank 4 or any objects that took up the same amount of space. It followed that there was more liquid nitrogen in the test tank than in Tank 4. In the court's

59

view, the fact it took more than twenty-two hours for the liquid in the test tank to boil away was therefore irrelevant. (2-ER-227–28.)

But Dr. Miller explained that the difference in volume made no scientific difference. "[T]he *rate* at which the [liters] of liquid nitrogen that boil off will be the *same* because that's dependent upon the surface area of the tank, the temperature difference between the inside of that surface and the temperature on the outside, and the integrity or the gas conduction across the insulation system." (2-ER-243 (emphasis added).)

This was not ipse dixit. Dr. Miller cited a research paper lodged by Plaintiffs' counsel entitled "Cryostorage tank failures: temperature and volume loss over time after induced failure by removal of insulative vacuum." (*See* 2-ER-197 (identifying article); 2-ER-199–207 (copy of article); 2-ER-167–69.) The article discussed tests measuring the evaporation rate of liquid nitrogen in cryogenic storage tanks when their vacuums were removed, the type of test Dr. Miller performed. (2-ER-200.) One of the tanks, labeled Tank 3, was fitted with an inventory rack, while others were not. (2-ER-201–03.) The researchers concluded that the rack's presence had minimal effect on

the evaporation rate. (*See* 2-ER-203, 2-ER-205–06 (article confirms this

observation).) The research paper supported Dr. Miller's position that

excluding storage materials from his test tank did not undermine his

results. In any event, it was not up to the district court to decide

whether the storage boxes affected the boiloff rate. The record

contained conflicting evidence on the issue, and it should have been left

to the jury to resolve the issue. *See Lever Bros. Co. v. Atlas Assur. Co.*,

131 F.2d 770, 772, 774–75 (7th Cir. 1942) (allowing a jury to decide

whether a tank storing cottonseed oil exploded because water in the

bottom of the tank overheated or because a faulty weld in a pipe broke

due to excess pressure).

The district court's second reason for excluding Dr. Miller's test

was that, to eliminate the vacuum, Dr. Miller introduced nitrogen gas

into the vacuum layer between the inner and outer tank walls, rather

than creating an interior leak, as Plaintiffs theorized. (2-ER-228.) In

the court's view, "Dr. Miller did not attempt to simulate how the tank

would function if there were an interior weld crack" and failed to

demonstrate that this difference was "immaterial to the relevance of the

test." (2-ER-228.)

Once more, the court incorrectly applied the rule that governs simulations, instead of the rule that governs illustrative tests. As explained, Dr. Miller was not attempting to simulate the accident, he was testing scientific premises: whether liquid nitrogen "could boil away at a high enough rate to—for it to go away in that many hours and that there was no visible sign or evidence that there was failure." (2-ER-214.) He "did a worst case test . . . to produce the worst vacuum conditions . . . . [I]f we have the worst possible vacuum failure, if we have completely one atmosphere of nitrogen there what happens, then what's the boiloff rate going to be." (2-ER-213.)

An expert's test demonstrating a principle of physics—here, how long it takes for liquid nitrogen to evaporate if the vacuum protecting the liquid suddenly disappears—is admissible as long as "the test on which the evidence is premised was 'properly conducted.'" *Jodoin*, 284 F.3d at 278–79 (citation omitted). Here, Dr. Miller's test was properly conducted and can easily be replicated.

The court's third ground for excluding Dr. Miller's test was that Dr. Miller performed the test only once. "Dr. Miller's 'use of a single test prevents him from calculating averages or error rates.' *Rovid v.*

*Graco Children's Prod. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018) ('Without multiple tests, [the expert] cannot show that his results are reproducible or reliable.')." (2-ER-228.) The court acknowledged that "*Daubert* does not explicitly require repeat testing, but it does state that 'in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error.'" (2-ER-228 (citation omitted).)

The district court misconstrued the importance of error rates in scientific testing. *Daubert* held that error rates are relevant in judging the admissibility of certain types of scientific techniques, for example, the spectrographic voice analysis at issue in *United States v. Smith*, 869 F.2d 348, 353–54 (7th Cir. 1989). Spectrograms transform recorded voices into electrical coordinates used to identify speakers. *Id.* at 353, n.9. Some errors are expected, and the test must achieve a certain level of accuracy to be admissible. *Smith* held the results of a voice identification test were admissible because they were usually correct: "the error rate for false identifications was 2.4% and the error rate for false eliminations was about 6%." *Id.* at 353. Similar analysis applies to lie-detector tests. *Id.* In each situation, there is a correct answer to

the question whether the spectrograph has correctly identified the speaker or the lie detector has detected whether a statement was the truth. If the test usually produces that correct answer, test results are admissible. *See id.* at 353–54.

Dr. Miller's test is fundamentally different. There is no right or wrong answer to the question how fast liquid nitrogen evaporates from a cryogenic tank. There is no "error rate" for Dr. Miller's experiment.

The court's reliance on *Rovid* was misplaced. In *Rovid*, the plaintiff's expert concocted a test to determine how much carbon dioxide an infant would "re-breathe" when lying face down on a sleeping surface that trapped exhaled $CO_2$. *Rovid*, at *4. The expert placed toy dolls face down on forty-two mattresses, but the test was not rigorous. The expert "positioned the toy doll by 'put[ting] it down vertically on the mattress and I let go . . . whatever position, depending on the stiffness . . . it[ ] kind of assumes its own position and I didn't attempt to reposition it in' the tests for the initial report." *Id.* at *6 (citation omitted). Furthermore, the expert's own testing protocol required three repetitions, but the expert performed only one test. *Id.* at *5. And repetitions were impossible: placing the dolls face down on mattresses

64

"does not control for numerous potentially relevant factors, including (i) the location of the toy doll with respect to the mattress—e.g., on the middle or edge of the mattress; (ii) the position of the toy doll's body on the mattress—i.e., lengthwise or widthwise; (iii) the position of the toy doll's extremities; or (iv) the position of the toy doll's face with respect to its body—a factor that can vary significantly." *Id*. at *6.

None of these problems afflict Dr. Miller's test. There was no standard requiring test repetitions, there were no outside factors affecting the outcome, there was nothing inexact about performing the test, and the test can easily be repeated by others following Dr. Miller's instructions. The district court abused its discretion by ruling the test was inadmissible simply because Dr. Miller performed the test once.

### E.   Excluding Dr. Miller's test was prejudicial.

An evidentiary error is presumed prejudicial, and the appellee bears the burden of rebutting the presumption. *Obrey v. Johnson*, 400 F.3d 691, 699–701 (9th Cir. 2005). Here, Plaintiffs cannot shoulder their burden of showing that the exclusion of Dr. Miller's test was harmless.

65

Excluding Dr. Miller's test deprived Chart of its strongest evidence to rebut Plaintiffs' theory that liquid nitrogen leaked through a hole in the tank and completely evaporated in twenty-two hours. Dr. Miller claimed liquid nitrogen cannot evaporate that quickly (3-ER-504–05), but the court sapped his testimony of strength because he could not discuss an illustrative experiment that refuted Plaintiffs' theory.

Dr. Miller's test was a linchpin of Chart's defense. If the jury agreed that a sudden breach of the vacuum could not have caused the accident, it would have rejected Plaintiffs' product liability theory. Even if the jury concluded that Chart acted negligently because it failed to recall the malfunctioning controller, it likely would have apportioned greater fault to PFC. Only the lab knew that the controller on Tank 4 had stopped working. PFC could have prevented the accident by transferring the contents to its backup tank or installing another alarm system on the tank.

Plaintiffs' closing argument confirms the importance of the excluded evidence. During rebuttal, Plaintiffs' counsel argued that "[w]ith regard to the suggestions about Dr. Miller, take note. *Dr. Miller*

66

*did not conduct any tests in this case.*"  (3-ER-529 (emphasis added).)
This statement was untrue, and Plaintiffs' counsel knew it.

Similar misconduct confirmed the prejudicial effect of an
evidentiary error in *Crawford v. City of Bakersfield*, 944 F.3d 1070
(9th Cir. 2019).  In that case, the court erroneously excluded evidence
that a victim of a police shooting exhibited signs of mental illness.  *Id.*
at 1072, 1078–79, 1081.  In analyzing prejudice, this Court pointed out
that, during closing argument, defense counsel had argued plaintiff's
"mental illness theory had '[z]ero' evidentiary support."  *Id.* at 1080.
That statement was false, and the fact counsel said it showed the
importance of the missing evidence.  This Court agreed: "Defendants'
emphasis on the absence of the erroneously excluded evidence in their
closing demonstrates the importance of that evidence."  *Id.* at 1081.
The same is true here.

For these reasons, the Court should reverse the judgment and
order a new trial at which Chart may introduce Dr. Miller's test,
thereby permitting the jury to assess issues such as liability and
allocation of fault as between Chart and PFC in light of the erroneously
excluded evidence.

**III.   The district court erroneously excluded evidence that PFC allowed the level of liquid nitrogen in Tank 4 to run low.**

**A.   Chart offered (but the court excluded) evidence that PFC had previously let liquid levels run low.**

To buttress Dr. Miller's opinion that the tank failed because it ran out of liquid nitrogen, Chart sought to introduce evidence that PFC had *previously* neglected to keep Tank 4 filled.  Data recorded in 2013 and 2014 showed multiple shortfalls:

- Between July 19, 2013, and July 17, 2014, the liquid level in Tank 4 fell below 9.0 inches on 80 occasions.

- On October 30, 2013, the liquid level in Tank 4 dropped to 3.0 inches.

- From December 26, 2013, to December 30, 2013, Tank 4 had a level below 8.0 inches.

- From December 28, 2013, to December 30, 2013, the level was below 4.0 inches.

- On December 30, 2013, the liquid level in Tank 4 dropped to 0 inches.

- From January 17, 2014, to January 20, 2014, the level was again below 8.0 inches.

- On January 20, 2014, the level again dropped to 0 inches.

(2-ER-100.)

Plaintiffs moved to bar Chart's experts from discussing this evidence because "PFC's prior bad acts [are] not admissible to prove

68

that PFC also acted inappropriately in 2018 and caused Tank 4 to lose liquid nitrogen." (2-ER-268–69.) The court granted the motion on a different ground, ruling that "[t]he inferential leap Chart makes from the 2013/2014 readings to the cause of the 2018 accident is too attenuated to be probative." (2-ER-224–25.) The court also granted Plaintiffs' subsequent motion to preclude all witness, not only experts, from discussing this evidence. (2-ER-182 (motion); 2-ER-156 (ruling).)

During trial, Chart asked the court to reconsider. It argued the evidence was admissible to rebut two PFC witnesses who testified there were *no* prior occasions when the level of liquid nitrogen in Tank 4 had been too low. The first witness was PFC embryologist Erin Fischer, who testified as follows:

> Q. Did you ever observe lower liquid nitrogen levels than you would expect in Tank 4?
>
> A. No.
>
> Q. Always had plenty of liquid nitrogen as far as you know?
>
> A. As far as I know, yes.
>
> Q. What about the other freezer tanks in the lab, did you ever see any tank that had any concerning level of liquid nitrogen prior to March 4th, 2018?
>
> A. No, I have not.

(3-ER-470.)

69

Plaintiffs' counsel elicited similar testimony from Dr. Conaghan:

Q. Before March 4th, was there ever an instance in which you believe the liquid nitrogen in Tank 4 ever dropped below six inches?

A. I believe it never dropped below six inches.

Q. Would that have been a notable event at the clinic?

A. Absolutely, yes.

(3-ER-420.)

The court denied Chart's request, ruling the witnesses merely said they were not *aware* of prior low readings and the fact there might have been low readings did not impeach that testimony. (3-ER-479.)

## B. Excluding the evidence was a prejudicial abuse of discretion.

"Any party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607. "Of course, '[i]mpeachment by contradiction is authorized by Rule 607.'" *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1193 (9th Cir. 2005) (citation omitted).

Here, evidence that the level of liquid nitrogen fell dangerously low in 2013 and 2014—twice to zero inches, twice below four inches—was admissible to impeach the testimony of two PFC witnesses.

70

Dr. Conaghan testified that if the liquid level ever fell below six inches, it would have been a "notable event at the clinic." (3-ER-420.) By testifying they did not recall such an event, he and Fischer communicated the event never occurred, or else they would have remembered it.

Excluding the records showing low levels of liquid nitrogen was prejudicial. Chart had two bases to rebut Plaintiffs' position that the liquid nitrogen evaporated in a single night through a hole in the tank. The court blocked both: it would not allow Chart to introduce Dr. Miller's test demonstrating the coolant could not evaporate that quickly; and it would not permit Chart to introduce evidence that PFC's failsafe procedures for keeping the tank full had failed before. Combined, these errors tied Chart's hands and precluded it from defending itself. Chart should be granted a new trial, at a minimum on such issues as liability and allocation of fault, in which its defense is not hamstrung by the court's errors in ruling on critical evidentiary issues.

## CONCLUSION

The judgment should be reversed and the case remanded to the district court for a new trial. If the judgment is not reversed, it should at minimum be modified to strike the awards of emotional distress damages.

May 11, 2022

**HORVITZ & LEVY LLP**
  FREDERIC D. COHEN
  STEPHEN E. NORRIS
  PEDER K. BATALDEN
**SWANSON, MARTIN & BELL, LLP**
  JOHN J. DUFFY
  KEVIN M. RINGEL
  MARGARET C. REDSHAW
**ZENERE COWDEN & STODDARD APC**
  MARC G. COWDEN
  ADAM STODDARD

By: _____ s/Frederic D. Cohen _____

Attorneys for Defendant-Appellant
**CHART INC.**

## STATEMENT OF RELATED CASES

Chart knows of no related cases within the meaning of Circuit Rule 28–2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____21-17016_____

I am the attorney or self-represented party.

**This brief contains** _13,074_ **words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint
brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/Frederic D. Cohen_____ **Date** _____May 11, 2022_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/18*