No. 21-17016

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE PACIFIC FERTILITY CENTER LITIGATION

A.B., et al.,
*Plaintiffs-Appellees*,

v.

CHART INC.,
*Defendant-Appellant*.

On Appeal from the United States District Court
For the Northern District of California
The Honorable Jacqueline Scott Corley, District Judge
Case No. 3:18-cv-01586-JSC

## APPELLEES' ANSWERING BRIEF

Dena C. Sharp
Adam E. Polk
Nina R. Gliozzo
GIRARD SHARP LLP
601 California Street
Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800

Amy M. Zeman
Geoffrey A. Munroe
GIBBS LAW GROUP LLP
1111 Broadway
Suite 2100
Oakland, CA 94607
Tel: (510) 350-9700

Adam B. Wolf
Tracey B. Cowan
PEIFFER WOLF CARR
KANE CONWAY &
WISE, LLP
4 Embarcadero Center,
Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED.............................................................................4

STATEMENT OF THE CASE ................................................................5

    A.   The March 4th incident: Tank 4 loses liquid nitrogen and
imploders. ............................................................................5

    B.   Plaintiffs suffer severe emotional distress as a result of the
March 4th incident and its impact on their ability to have
biological children in the future...........................................6

    C.   Plaintiffs' strict liability claims: Chart's use of a partial
penetration weld and failure to accommodate for repetitive
thermal stress caused the March 4th incident .......................8

    D.   Plaintiffs' claim for negligent failure to retrofit the tank's
controller: PFC was unable to detect the failure because of a
defect Chart had known about for more than 2 years.............9

    E.   Chart's misuse defense: The tank's weld didn't crack until PFC
caused the tank to spontaneously implode by failing to refill it
over the course of several weeks. ........................................11

    F.   Chart agrees the jury may award emotional distress damages if
it finds for Plaintiffs on their strict liability claims. .............15

    G.   The jury finds Chart liable on all three claims; Chart does not
challenge the award of emotional distress damages in its post-
trial motions. .....................................................................17

SUMMARY OF THE ARGUMENT .....................................................19

ARGUMENT ........................................................................................21

    I.   Chart waived its arguments against emotional distress damages.................21

# TABLE OF CONTENTS (cont'd)

Page

A.    Chart agreed on multiple occasions the jury could award emotional distress damages. ................................................21

B.    The general verdict rule does not require review; the jury entered a special verdict. ............................................................23

C.    Discretionary review is not warranted and would prejudice plaintiffs. .......................................................................................25

II.  If the Court elects to consider the waived issue, it should affirm the jury's award of emotional distress damages. ...............................27

A.    Emotional distress damages are available under Plaintiffs' strict liability claims. ................................................................27

B.    Emotional distress damages are also available under Plaintiffs' claim for negligent failure to recall or retrofit. ......................31

1.   Plaintiffs' emotional distress is compensable as an item of parasitic damages. ...............................................32

2.   Plaintiffs' emotional distress is compensable under the direct victim theory because Chart owed them a legal duty to recall or retrofit the cryogenic tank that stored their eggs and embryos. ..........37

III. The district court properly excluded Miller's test and controller readings from 2013 and 2014. .......................................................40

A.    Miller's tank test was not sufficiently similar and too unreliable to present to the jury. .............................................40

1.   The substantial similarity standard applies to Miller's test ................42

2.   The district court applied the correct legal standard because Miller's test replicated key aspects of the Tank 4 incident and thus may have misled the jury. ...........................................43

3.   Miller's test was neither substantially similar nor sufficiently reliable. .............................................................48

# TABLE OF CONTENTS (cont'd)

Page

4.  Chart was not prejudiced by any error. ...............................52

B.  The district court properly excluded evidence regarding past liquid nitrogen levels in Tank 4. ...........................................55

1.  The district court excludes the 2013-14 readings under Rule 404(b). .........................................................................55

2.  The 2013-14 readings were properly excluded .................................56

3.  Chart was not prejudiced by the exclusion of the 2013-14 readings..........................................................................59

CONCLUSION ..........................................................................................61

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                Page(s)

*Amor Ministries v. Century Sur. Co.*,
  No. 3:13-cv-01441 GPC (BGS), 2016 WL 1388077 (S.D. Cal. Apr. 7, 2016)...33

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ...............................................................22

*Ben-Shimol v. Trans World Airlines, Inc.*,
  No. C-93-1586 MHP, 1996 WL 40202 (N.D. Cal. Jan. 19, 1996)... 19, 28, 29, 31

*Boyd v. City & Cty. of San Francisco*,
  576 F.3d 938 (9th Cir. 2009) ...............................................................59

*Brown v. Sierra Nevada Mem'l Miners Hosp.*,
  849 F.2d 1186 (9th Cir. 1988) ............................................................59

*Burgess v. Superior Ct.*,
  2 Cal. 4th 1064 (1992) .................................................. 37, 38-39, 40

*Champeau v. Fruehauf Corp.*,
  814 F.2d 1271 (8th Cir. 1987) ............................................................47

*Crisci v. Sec. Ins. Co. of New Haven, Conn.*,
  66 Cal. 2d 425 (1967) ........................................................................33

*Cronin v. J.B.E. Olson Corp.*,
  8 Cal. 3d 121 (1972) ..........................................................................28

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................................... 42, 48

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
  95 F.3d 1422 (9th Cir. 1996) ..............................................................24

*Dilworth v. Gen. Elec. Co.*,
  No. 08-cv-431 WQH (JMA), 2008 WL 11337013 (S.D. Cal. July 16, 2008) ....33

# TABLE OF AUTHORITIES (cont'd)

<u>Cases</u>                                                                 Page(s)

*Erlich v. Menezes*,
  21 Cal. 4th 543 (1999) ........................................................36

*Est. of Kievernagel*,
  166 Cal. App. 4th 1024 (2008) ........................................34

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ............................................50

*Four Corners Helicopters, Inc. v. Turbomeca, S.A.*,
  979 F.2d 1434 (10th Cir. 1992) ................................... 43, 45

*Frisina v. Women & Infants Hosp. of Rhode Island*,
  No. CIV. A. 95-4037, 2002 WL 1288784 (R.I. Super. May 30, 2002)......... 34-35

*Fusco v. Gen. Motors Corp.*,
  11 F.3d 259 (1st Cir. 1993)................................... 44, 45, 46

*Gilbert v. Cosco Inc.*,
  989 F.2d 399 (10th Cir. 1993) ..........................................45

*Gu v. BMW of N. Am., LLC*,
  132 Cal. App. 4th 195 (2005) ..........................................27

*Guillory v. Domtar Indus. Inc.*,
  95 F.3d 1320 (5th Cir. 1996) ...................................... 44-45

*Haddad v. Lockheed Cal. Corp.*,
  720 F.2d 1454 (9th Cir. 1983) .................................... 52-53

*Hernandez v. Badger Constr. Equip. Co.*,
  28 Cal. App. 4th 1791 (1994) ..........................................38

*Holliday v. Jones*,
  215 Cal. App. 3d 102 (1989) ............................................36

*Huggins v. Longs Drug Stores California, Inc.*,
  6 Cal. 4th 124 (1993) .....................................................40

# TABLE OF AUTHORITIES (cont'd)

Cases                                                                    Page(s)

*Ilyia v. Khoury*,
    671 F. App'x 510 (9th Cir. 2016) ..................................................................58

*Jodoin v. Toyota Motor Corp.*,
    284 F.3d 272 (1st Cir. 2002)....................................................... 46, 47, 51

*Justus v. Atchison*,
    19 Cal. 3d 564 (1977) ...........................................................................39

*Kately v. Wilkinson*,
    148 Cal. App. 3d 576 (1983) ........................................................ 28, 31

*Lunghi v. Clark Equip. Co.*,
    153 Cal. App. 3d 485 (1984) ...............................................................38

*Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*,
    48 Cal. 3d 583 (1989) ................................................................... 37, 39

*McCollum v. California Dep't of Corr. & Rehab.*,
    647 F.3d 870 (9th Cir. 2011) ...............................................................56

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ..........................................................52

*McKnight By & Through Ludwig v. Johnson Controls, Inc.*,
    36 F.3d 1396 (8th Cir. 1994) .................................................. 42-43, 46

*Merenda v. Superior Ct.*,
    3 Cal. App. 4th 1 (1992) ........................................................ 26, 34, 37

*Milwaukee Elec. Tool Corp. v. Superior Ct.*,
    15 Cal. App. 4th 547 (1993) ................................................................31

*Molien v. Kaiser Found. Hosps.*,
    27 Cal. 3d 916 (1980) ..........................................................................33

*Montana Sulphur & Chem. Co. v. U.S. E.P.A.*,
    666 F.3d 1174 (9th Cir. 2012) .............................................................57

# TABLE OF AUTHORITIES (cont'd)

Cases   Page(s)

*Muth v. Ford Motor Co.*,
461 F.3d 557 (5th Cir. 2006) ............................................... 43, 45, 47

*Nachtsheim v. Beech Aircraft Corp.*,
847 F.2d 1261 (7th Cir. 1988) ............................................. 47

*Nelson v. Superior Ct.*,
144 Cal. App. 4th 689 (2006) ....................................... 30, 31

*Pandit v. Am. Honda Motor Co.*,
82 F.3d 376 (10th Cir. 1996) ............................................. 47

*Perry-Rogers v. Obasaju*,
723 N.Y.S.2d 28 (N.Y. App. Div. 2001) ...................... 30, 36

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of
Health & Hum. Servs.*, 946 F.3d 1100 (9th Cir. 2020).......................... 25, 26, 27

*Potter v. Firestone Tire & Rubber Co.*,
6 Cal. 4th 965 (1993) ............................................. 34, 36, 37

*Primus v. Target Corp.*,
532 F. App'x 314 (3d Cir. 2013) ......................................... 57

*Robinson v. United States*,
175 F. Supp. 2d 1215 (E.D. Cal. 2001) ............................... 32

*Samuels v. Holland Am. Line-USA Inc.*,
656 F.3d 948 (9th Cir. 2011) ............................................. 42

*Shepard v. Superior Ct.*,
76 Cal. App. 3d 16 (1977) ........................................... 28, 31

*Sims v. Great Am. Life Ins. Co.*,
469 F.3d 870 (10th Cir. 2006) ........................................... 60

*Taylor v. Honeywell Int'l, Inc.*,
599 F. App'x 664 (9th Cir. 2015)....................................... 39

# TABLE OF AUTHORITIES (cont'd)

Cases                                                                              Page(s)

*Tompkins v. Medtronic*, Inc.,
   17 F.3d 396 (9th Cir. 1994) .............................................................42

*United States v. $11,500.00 in United States Currency*,
   869 F.3d 1062 (9th Cir. 2017) .........................................................23

*United States v. Bacon*,
   979 F.3d 766 (9th Cir. 2020) ...........................................................50

*United States v. Gilbert*,
   57 F.3d 709 (9th Cir. 1995) .............................................................58

*United States v. Kowallek*,
   438 F. App'x 889 (11th Cir. 2011) ...................................................58

*United States v. Miller*,
   738 F.3d 361 (D.C. Cir. 2013)..........................................................58

*United States v. Sine*,
   493 F.3d 1021 (9th Cir. 2007) ........................................... 56, 57, 58

*United States v. Tracey*,
   675 F.2d 433 (1st Cir. 1982)............................................................57

*Vicente v. Barnett*,
   415 F. App'x 767 (9th Cir. 2011) .....................................................23

*Voohries-Larson v. Cessna Aircraft Company*,
   177 F.R.D. 462 (D. Ariz. 1998).......................................................47

*Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*,
   979 F.3d 1209 (9th Cir. 2020) ................................................... 49-50

*Windeler v. Scheers Jewelers*,
   8 Cal. App. 3d 844 (1970) ...............................................................35

*Witt v. Yale-New Haven Hosp.*,
   977 A.2d 779 (Conn. Super. Ct. 2008) ....................................... 35, 36

# TABLE OF AUTHORITIES (cont'd)

<u>Cases</u>                                                                   Page(s)

*Zavala v. Arce*,
    58 Cal. App. 4th 915 (1997) ................................................................39

*Zhang v. Am. Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) ................................................... 23, 24

<u>Statutes</u>

28 U.S.C. § 1332(a) ..............................................................................4

California Civil Code § 1431.2 ...................................................... 24, 33

<u>Rules</u>

Federal Rule of Evidence 404(b) ....................................... 3, 5, 55-56, 58

## INTRODUCTION

Plaintiffs are fertility patients whose ability to have biological children was forever altered when the cryogenic tank used to store their frozen eggs and embryos abruptly failed on March 4, 2018. Following a three-week trial, a jury concluded that the March 4th incident was caused by an interior weld crack and assigned primary responsibility for the resulting damage to Chart. The jury found Chart strictly liable for manufacturing the tank with a partial penetration weld instead of the full penetration weld called for by the tank's specifications, and for certain design elements that rendered the tank unable to withstand repetitive thermal stress. It also found Chart liable for negligently failing to recall or retrofit the tank's electronic controller. Chart knew the controller was dangerously defective for over two years but chose to do nothing about it, and as a result, the controller failed to detect the tank's rapidly falling liquid nitrogen levels.

Chart says the jury should not have been allowed to compensate Plaintiffs for their emotional distress. But Chart itself proposed a verdict form that allowed for the award of emotional distress damages. It then confirmed three more times that if the jury found for Plaintiffs on either of their strict liability theories—as it eventually did—the jury could award emotional distress damages. Chart has therefore waived the issue and should not be permitted to raise it on appeal.

The jury's award was consistent with California law, which has authorized the award of emotional distress damages in connection with strict liability claims for more than forty years. The primary purpose of strict liability is to ensure that manufacturers bear the full cost of injuries caused by their defective products. And here, the foreseeable consequence of selling a defective cryogenic tank to a fertility clinic is considerable emotional distress on the part of the fertility patients who were depending on that tank to safeguard their reproductive futures.

Strict liability claims aside, Plaintiffs' recovery of emotional distress damages was also proper for their negligent-failure-to-recall claim. California law authorizes emotional distress damages under a "direct victim" theory when, as here, the emotional distress results from the breach of a duty imposed by law. Chart cites cases where a doctor owed no duty to a patient's spouse and where a pharmacist owed no duty to a patient's parents. But here Chart did owe Plaintiffs a duty: the duty of a manufacturer to recall or retrofit a dangerous product defect. The district court found that California law imposes just such a duty—a determination that Chart is not challenging. California law also authorizes compensation for Plaintiffs' emotional distress under a parasitic damages theory, where the presence of another form of damages provides a guarantee of genuineness that is not present in standalone claims for negligent infliction of emotional distress.

In addition to belatedly challenging the jury's ability to award emotional distress damages, Chart contests two of the district court's evidentiary rulings. Chart says the court wrongly excluded a test conducted by one of Chart's experts, Dr. Franklin Miller, because the court misunderstood Miller's test to be an illustration rather than a simulation. But Miller himself referred to his test as a simulation. Miller tried to disprove Plaintiffs' theory of what occurred, but he failed to account for the volume of tissue and equipment inside the tank (which, in turn, affected the amount of liquid nitrogen in the tank) and tested an external breach instead of the internal leak Plaintiffs allege caused the failure. The district court correctly required Chart to demonstrate that Miller's tank testing was sufficiently similar to the conditions in the failed tank at the time of the incident. And it exercised appropriate discretion by precluding Miller from presenting the results because his testing was too dissimilar and risked misleading the jury into believing he was recreating the March 4th incident.

The district court also appropriately exercised its discretion to preclude Chart from discussing seven-year-old data that was recovered from Chart's malfunctioning controller. Chart does not contest the district court's original exclusion of that data under Federal Rule of Evidence 404(b), but it claims two of the clinic's embryologists later opened the door to Chart's use of the evidence by testifying they did not observe the failed tank running low on liquid nitrogen prior

to the March 4th incident. The district court was correct to find that Chart had not laid a proper foundation for impeachment, however, as it did not and could not establish the witnesses were aware of low-level readings recorded by the controller in December 2013 and January 2014.

## JURISDICTIONAL STATEMENT

Plaintiffs agree with Chart's statement of jurisdiction. In addition to maintaining jurisdiction pursuant to CAFA, the district court also possesses diversity jurisdiction over Plaintiffs' claims because the amount in controversy exceeds $75,000 and Plaintiffs and Chart are citizens of different states. 28 U.S.C. § 1332(a).

## ISSUES PRESENTED

1.  Did Chart waive its ability to contest the jury's award of emotional distress damages by agreeing to jury instructions and a verdict form that provided for emotional distress damages?

2.  If Chart did not waive its arguments regarding emotional distress damages, was the jury permitted to compensate plaintiffs for their emotional distress after finding Chart liable under both strict liability and negligence theories?

3. Did the district court act within its discretion when it excluded the results of a test intended to disprove Plaintiffs' version of events as unreliable and too dissimilar from the conditions of the Tank 4 incident?

4. Did the district court act within its discretion in finding that the testimony of two embryologists did not sufficiently open the door to the use of years-old evidence previously excluded under Rule 404(b) as too attenuated to the 2018 tank failure at issue in the case?

## STATEMENT OF THE CASE

### A.   The March 4th incident: Tank 4 loses liquid nitrogen and implodes.

On Sunday, March 4, 2018, as the embryologists at the Pacific Fertility Center (PFC) were closing up for the day, they discovered that one of the lab's cryogenic storage tanks had lost liquid nitrogen and begun imploding—causing the tank's lid to become stuck in place. (3-ER-373–377; 531–532.) That cryogenic tank, which the clinic referred to as "Tank 4," had been topped off with liquid nitrogen just the day before. (3-ER-411.) The 2,500 embryos and 1,500 eggs stored inside should have been perfectly safe. Cryogenic tanks are essentially large thermoses. They last ten years or more (3-ER-410, 3-SER-363, 406), and even once their vacuum insulation begins to deteriorate, it takes weeks for all of a tank's liquid nitrogen coolant to evaporate (2-ER-131).

Tank 4's eggs and embryos were promptly transferred to a backup tank, but the damage had already been done. Tiny ice crystals formed as the reproductive tissue thawed and the jagged edges of those crystals caused significant intracellular damage or cell death. (3-ER-383; 3-SER-269–271.) Both PFC and other experts in the fertility field therefore warned patients of unknown risks if they subsequently used their tissue from Tank 4 in future IVF procedures. (3-ER-434, 472; 3-SER-286–287.)

**B.    Plaintiffs suffer severe emotional distress as a result of the March 4th incident and its impact on their ability to have biological children.**

Plaintiffs are five of the patients whose eggs or embryos were stored in Tank 4 at the time of the March 4th incident. They filed suit against Chart and PFC for irreversibly damaging their reproductive tissue, impairing their ability to have biological children, and triggering severe emotional distress. (2-SER-197.) Their claims against PFC were ordered to arbitration and have since settled. Their claims against Chart were tried over three weeks in May and June 2021.

Each plaintiff testified at length regarding the trauma and anguish they experienced as a result of the March 4th incident. (1-ER-16.) Chloe Poynton, who is now 39, testified that she desperately wants children and fears that may never become a reality, that she developed chronic hives after the incident, and that the loss of her frozen eggs has impacted her personal relationships and search for a

partner. (3-SER-293–299.) Adrienne Sletten, who is now 43, testified about her desire to have a family, and how her feelings of paralysis and inability to move forward with her life after the incident impede realization of that goal. (3-SER-277–279.) Rosalynn Enfield, who was pregnant at the time of the incident but miscarried two months later, recounted her shock and disappointment, and how she was crushed when the eggs were not there when she needed them after her post-incident miscarriage. (3-SER-280–284.) The Parsells testified how they view each embryo as a child and a member of their family and how they had planned to use each of their four embryos in Tank 4 and were devastated after the incident. (3-SER-285–287, 290–292.) Kevin Parsell described how he no longer trusts IVF professionals, and Laura Parsell explained her grief is ongoing and that the impact of the incident was like having four of her family members ripped from her life. (3-SER-287–288, 291.)

The jury also heard from Dr. Elizabeth Grill, an expert in reproductive psychology, who evaluated the five plaintiffs and concluded that "each one of them experienced a significant amount of distress and trauma as a result of the tank incident." (3-SER-302.) Dr. Grill explained that all five of the plaintiffs "did everything right" to preserve their fertility options, but are "now in a place of devastation and grief and having to make choices that they were trying to avoid to begin with." (3-SER-306.) Chart conducted minimal cross-examination of the

plaintiffs and elected not to call its previously disclosed reproductive psychologist to the stand.

### C. Plaintiffs' strict liability claims: Chart's use of a partial penetration weld and failure to accommodate for repetitive thermal stress caused the March 4th incident

Following the March 4th incident, Tank 4 underwent several days of post-mortem testing. (3-SER-219.) The testing was jointly conducted by Chart, PFC, and Plaintiffs, and revealed a crack in one of Tank 4's interior welds. (3-SER-220–222.) The testing also revealed a manufacturing defect: the tank's design specifications called for a full penetration weld, but the weld that cracked was instead a partial penetration weld. (3-SER-223–224, 361.)


*Full penetration weld*


*Tank 4's weld*

(4-SER-397, 399.)

A full penetration weld was necessary because the weld is subjected to repetitive stress from thermal expansion and contraction throughout its lifetime. (2-

ER-349-350.) Portions of Tank 4's partial penetration weld were paper thin and therefore not strong enough to withstand that repetitive thermal stress. (3-SER-229.) While Chart's own failure analysis acknowledged this issue, Chart never told customers that its tanks could fail in this way. In the event of an interior weld crack, Chart's failure analysis says that liquid nitrogen draws into the tank's vacuum insulation, expands rapidly, and triggers an inner vessel implosion and complete loss of freezer functionality—exactly what happened to Tank 4. (4-SER-414.)

The parties' joint testing also revealed design defects. The tank's fill tube fitting did not sit flush against the tank and was welded only on one side—creating a stress concentrator that helped cause the cracked weld. (3-SER-231–232.) Dr. Anand Kasbekar, a forensic engineer who attended the joint testing on behalf of Plaintiffs, testified that a double-sided weld was feasible, inexpensive, and would have prevented the March 4th incident by eliminating that stress concentrator. (3-SER-231–238.)

**D.   Plaintiffs' claim for negligent failure to retrofit the tank's controller: PFC was unable to detect the failure because of a defect Chart had known about for more than two years.**

Seventeen days before the March 4th incident, Tank 4's electronic controller went haywire: it lost the ability to accurately report the tank's temperature and liquid-nitrogen level, causing it to issue non-stop false alarms and continually fill

the tank with more liquid nitrogen. (3-ER-425–431.) To stop the tank from overflowing and to eliminate the false alarms, PFC's lab director unplugged the controller and switched to manual monitoring. (3-ER-430–431.) He had worked with cryogenic storage containers his entire career and believed this to be an acceptable short-term solution. (3-SER-257–260.) Based on his training and experience, he expected if Tank 4 were failing, it would exhibit telltale signs over the course of weeks before losing its ability to maintain cryogenic temperatures. (*Id.*) An expert witness who has served as an IVF lab director for over 30 years agreed: those who work with cryogenic vessels are trained to expect them to lose their vacuum insulation gradually and exhibit easily recognizable symptoms like frost forming on the tank's exterior. (3-SER-272–275, 279.) PFC's lab director simply did not know what Chart knew: that Tank 4 could lose all its vacuum insulation overnight due to a crack in the tank's welding. (4-SER-414.)

If Tank 4's electronic controller were functioning properly on March 4th, it would have issued a low-level alarm and PFC staff could have transferred Plaintiffs' eggs and embryos to another tank before they were damaged. (3-SER-253–256.) Plaintiffs therefore faulted PFC for failing to replace Tank 4's controller in the 17 days that elapsed between its malfunction and the March 4th incident. (3-SER-376–378.) But they faulted Chart more because Chart knew far earlier than

PFC that Tank 4's controller was defective and failed to replace it for *over two years*. (*Id.*)

Tank 4's controller was a Chart TEC-3000, and Chart had known since 2015 that the TEC-3000 suffers from a defect that causes it to lose the ability to accurately monitor liquid nitrogen levels. (4-SER-430–431, 443–447, 449–450.) Chart had made repeated visits to IVF clinics whose controllers had malfunctioned, and internally acknowledged the controller failures were a "critical issue" about which it "need[ed] an answer urgently." (3-SER-240–242; 4-SER-457–458.) By February 2016, Chart's product manager had identified a solution and urged the company to "take action immediately." (2-ER-151; 4-SER-453.) But even though Chart had a retrofit available, it did not notify PFC or other customers about the defect, offer to retrofit PFC's or other customers' controllers, or issue a recall notice. (3-SER-246, 250–251; 4-SER-391–392.) Had Chart recalled or retrofitted Tank 4's controller prior to the March 4th incident—as it had a duty to do under California law—Plaintiffs' eggs and embryos could have been saved.

### E. Chart's misuse defense: The tank's weld didn't crack until PFC caused the tank to spontaneously implode by failing to refill it over the course of several weeks.

At trial, Chart disclaimed all responsibility for the March 4th incident and argued Tank 4 did not fail due to a cracked weld. It maintained PFC misused Tank 4 by unplugging its controller and then failing to fill the tank over the course of

several weeks. (3-SER-307, 325, 360.) When the tank eventually ran dry, Chart claimed it spontaneously imploded and that implosion is what caused its weld to crack. (3-ER-499, 501; 3-SER-368–370.)

Chart advanced this alternate theory of causation through the testimony of Dr. Franklin Miller, an expert in cryogenics. (3-ER-489.) Cryogenic tanks use a getter—consisting of zeolite material that looks like kitty litter and functions similarly to a desiccant pack—to absorb stray gas molecules and preserve the tank's vacuum. Miller posited that the getter could have overloaded and caused the tank to implode when PFC supposedly allowed the tank to run dry. (3-ER-499, 501.) Miller admitted that despite working with cryogenic tanks his entire career, he has never seen one implode due to an overloaded getter. (3-SER-343–345.) To his knowledge, no such instance has ever been documented. (*Id.*) And while Chart's own cryogenic engineers have identified dozens of ways its tanks could potentially fail—including due to a cracked weld—Chart has never indicated that the tank's getter could trigger an implosion. (3-SER-342; 4-ER-406–429.) Chart's product manual even advises customers to dry out their tanks from time to time; it does not say that the tank might implode when they do so. (4-SER-404–405.) Miller acknowledged that his theory would require a small long-term leak that allowed excessive amounts of gas into the tank's vacuum layer. (3-ER-501; 3-SER-362.) He posited that the o-ring in the tank's vacuum plug could have cracked

or degraded, but then admitted that Chart fully inspected the tank and o-ring during the parties' joint testing and never found any such leak. (3-SER-364–365.) Miller had not participated in the joint testing himself; he was retained only after that testing revealed a crack in Tank 4's welding. (3-SER-344–345.)

Miller's alternate theory of causation required the jury to believe that PFC's embryologists ignored Tank 4 for at least a week, and likely several weeks, before it could run dry. (3-SER-352, 358, 367.) But Chart's own experts confirmed that in the 17 days leading up to the March 4th incident, a PFC embryologist (i) activated the tank's fill feature every day but two (Feb. 21 and Feb. 24) and (ii) manually verified that the tank was full of liquid nitrogen by entering fill level into the lab's monitoring software every day but two (Feb. 15 and Feb. 28). (3-SER-308–309, 374, 381.) Miller posited that perhaps the liquid nitrogen supply tanks were empty and so PFC's embryologists were filling Tank 4 with air each day. (3-SER-353–354.) But he admitted that a hot-gas alarm would have sounded if the tank was being filled with air for a prolonged period, and Tank 4's digital records show it never did. (3-SER-355–356.) In addition, PFC used a common liquid nitrogen plumbing system for all six of its cryogenic tanks, so if the supply was empty, other tanks also would have experienced low liquid nitrogen levels—but none did. (3-ER-394–397.)

Miller initially testified that a photo of Tank 4 taken after the implosion led him to conclude that a weld crack could not have caused the March 4th incident. Miller claimed, "a line you can see just around the edge … is liquid nitrogen," and that the weld couldn't have cracked yet because if it had, the liquid nitrogen would have been boiling vigorously, bubbling, and emitting fog—not "sitting there happily." (3-SER-320–324, 326, 328–329.) Miller said he had no doubt at all the line in the photo was liquid nitrogen. (3-SER-333.) On cross-examination, however, Miller admitted that the line was likely just a shadow (*Id.*), and withdrew his prior opinion:

> Q. Dr. Miller, is it still your opinion that liquid nitrogen is at the line that you described earlier?
>
> A. I have already answered that. No, it is not my opinion that it is at that line.

(3-SER-341).

Miller further testified that PFC could not have measured Tank 4's liquid nitrogen levels at 14 inches on March 3rd because that much liquid nitrogen could not evaporate in 22 hours—even if an interior weld cracked. (3-SER-346–347.) Miller acknowledged that Chart had documented instances where customers experienced a sudden vacuum failure and lost an inch of liquid nitrogen every hour. (3-SER-348–349; 4-SER-439.) But Miller said that based on his experience,

it would take "[a]bout 30 hours" for all of Tank 4's liquid nitrogen to evaporate. (3-SER-347.)

Chart wanted to present the results of a test Miller had run where he "simulated performance with full vacuum failure." (2-SER-183.) Miller was permitted to show a picture from his test, (2-SER-54), but was otherwise precluded from testifying about it (1-ER-7–8, 2-ER-160, 229). The district court excluded Miller's test because he used substantially more liquid nitrogen than was in Tank 4 at the time and simulated an external rather than internal breach, and so did not run an accurate simulation. (*Id.*) Instead of filling a tank full of IVF equipment up to the 14-inch mark, which would have used around 120 liters of liquid nitrogen, Miller filled an empty tank up to 15 inches, which used roughly 155 liters of liquid nitrogen. (2-SER-112, 186.)

### F. Chart agrees the jury may award emotional distress damages if it finds for Plaintiffs on their strict liability claims.

Prior to trial, the parties each proposed jury instructions and verdict forms that provided for emotional distress damages. (2-SER-58, 66, 77, 87, 97, 104–105.) The only difference was that Chart's verdict forms instructed the jury to enter an amount for emotional distress damages only if it found Chart liable to Plaintiffs under either of their two strict liability claims, whereas Plaintiffs' proposed verdict form also allowed jurors to award emotional distress damages if they found Chart

liable only under their negligence claim. (*Id.*) Chart's proposed verdict forms read as follows:

### Section IV.  Compensatory Damages

What are [Plaintiff's] damages?

1.     Economic loss:  Enter the amount below if you find that Chart is liable to plaintiff under the theories of Section I—Strict Liability (Manufacturing [*sic*] Defect); Section II—Strict Liability (Design Defect); or Section III—Negligence (Failure to Recall or Retrofit).

      Value of damaged/lost embryos:      $ _____

2.     Noneconomic loss:  Enter the amount below if you find that Chart is liable to plaintiff under the theories of Section I—Strict Liability (Manufacturing [*sic*] Defect) or Section II—Strict Liability (Design Defect).

      Pain, suffering, and emotional distress:    $ _____

             **[Plaintiff's] TOTAL**    $ _____

(2-SER-66, 77, 87, 97.)

In an accompanying trial brief, Chart explained that it believed California law precluded Plaintiffs from recovering emotional distress damages as part of their negligence claim. (2-ER-176.) But Chart did not argue that Plaintiffs were barred from recovering emotional distress damages as part of their strict liability claims. To the contrary, Chart opposed Plaintiffs' proposed verdict form because it did not "separate out Plaintiffs' negligence claims (for which they are not entitled to non-economic damages) from their strict liability claims." (2-ER-181.) Chart re-affirmed its position the week before trial commenced:

> **THE COURT:** … You're not arguing that on the strict liability they don't get emotional distress.
>
> **MR. DUFFY:** Not at this time, Your Honor.
>
> **THE COURT:** Right. So then the question is, you don't get it just on the failure to recall.
>
> **MR. DUFFY:** That's right.

(2-SER-51.)

At the charging conference, Chart had one final opportunity to object to jury instructions and a verdict form that permitted the jury to award emotional distress damages if it found for Plaintiffs on the strict liability claims. But once again, Chart confirmed that the only issue was "whether or not they could recover emotional damages in the negligence claim." (3-ER-524–525.)

The district court deferred a ruling on that isolated issue since it would only matter in the unlikely event that the jury found for Chart on the strict liability claims but for Plaintiffs on the negligence claim. (3-ER-525 ("Objection noted … If that's the only claim they find on, then we can readdress it again post judgment.").)

### G. The jury finds Chart liable on all three claims; Chart does not challenge the award of emotional distress damages in its post-trial motions.

The jury rejected Chart's affirmative defense, finding PFC did not misuse or modify Tank 4 in a way that was so highly extraordinary that it was not foreseeable to Chart. (1-ER-35.) It found for Plaintiffs on both strict liability claims, as well as

- 17 -

on the negligence claim: Tank 4 contained a manufacturing defect and a design defect that were substantial factors in causing the March 4th incident, and Chart's failure to recall or retrofit Tank 4's controller also was a substantial factor in causing the March 4th incident. (1-ER-37–39.) The jury also found that PFC's negligence was a substantial factor in causing the March 4th incident, but it assigned Chart the lion's share of the responsibility—finding Chart 90% responsible for the March 4th incident and PFC 10% responsible. (1-ER-40–41, 44.)

Because the jury found for Plaintiffs on at least one claim, it proceeded to complete the damages section of the verdict form. (1-ER-42–43.) It found that Adrienne Sletten suffered $75,000 in economic damages and $2,000,000 in emotional distress damages; Rosalynn Enfield $100,000 in economic damages and $2,500,000 in emotional distress damages; Chloe Poynton $100,000 in economic damages and $3,000,000 in emotional distress damages; and Laura and Kevin Parsell $200,000 in economic damages and $3,500,000 each in emotional distress damages. (*Id.*) Pursuant to California law regarding the apportionment of economic and non-economic damages, the district court converted the verdict form to a judgment that awarded Sletten $1,875,000; Enfield $2,350,000; Poynton $2,800,000; and the Parsells $6,500,000. (1-ER-34.)

## SUMMARY OF THE ARGUMENT

*1. Chart waived its arguments.* Chart contends the district court erred by providing the jury a verdict form that permitted an award of emotional distress damages. But Chart's own proposed verdict forms also provided for the recovery of emotional distress damages. Chart repeatedly confirmed that it did not object to an award of emotional distress damages if Plaintiffs prevailed on their strict liability claims—which Plaintiffs did. Chart has therefore waived the ability to challenge Plaintiffs' recovery of emotional distress damages on appeal.

*2. Emotional distress damages are recoverable under California law.* If the Court nonetheless elects to consider Chart's arguments, it should affirm the jury's award of emotional distress damages. "California law clearly allows emotional distress damages in actions premised on strict liability." *Ben-Shimol v. Trans World Airlines, Inc*., No. C-93-1586 MHP, 1996 WL 40202, at *2 (N.D. Cal. Jan. 19, 1996). California law also provides for the recovery of emotional distress damages in negligence actions—either as an item of parasitic damages or when the plaintiff is a "direct victim" to whom a legal duty was owed by the defendant. Chart owed Plaintiffs a legal duty to recall or retrofit Tank 4 after it learned its controller posed a serious risk of harm—a duty that the jury found Chart breached by failing to act as a reasonable manufacturer would under the same circumstances. Plaintiffs were therefore direct victims and may recover any emotional distress

damages resulting from Chart's negligence. Plaintiffs may also recover emotional distress damages because those damages are parasitic to the property damage they suffered as a result of the March 4th incident: the irreversible damage to their frozen eggs and embryos. That property damage provides a "guarantee of genuineness" that is not present in standalone claims for negligent infliction of emotional distress—particularly given the unique and precious nature of that property, which implicates Plaintiffs' ability to have biological children in the future and so naturally will entail significant emotional distress if negligently damaged or destroyed.

3. *The district court did not abuse its discretion when it excluded Miller's test*. Chart contends the district court applied the wrong legal rule in requiring Miller's test to be substantially similar to the conditions of the Tank 4 incident because Miller's test was an illustration rather than a simulation. Miller's own report acknowledged, however, that his test "simulated performance with full vacuum failure." (2-SER-183.) But because he simulated a vacuum failure via an exterior crack on a tank full of 155 liters of liquid nitrogen—when Tank 4 actually suffered an interior crack and contained only about 120 liters—the district court correctly recognized the substantial risk that the jury would be misled into thinking Miller was recreating the Tank 4 incident. Moreover, Chart was not prevented

from presenting its case because Miller was permitted to testify to scientific principles and use a photograph from his simulation to illustrate those principles.

*4. The district court did not abuse its discretion by excluding years-old controller data.* Two of PFC's embryologists testified that they were not aware of Tank 4 running low on liquid nitrogen prior to the March 4th incident. Chart claims their testimony opened the door to its use of previously excluded testimony: data from 2013-14 recovered from Tank 4's defective electronic controller. The district court correctly found that Chart had not laid a foundation that the witnesses were aware of that data, however, and therefore the previously excluded evidence was not relevant to rebut any false impression left by their testimony.

## ARGUMENT

### I. Chart waived its arguments against emotional distress damages.

#### A. Chart agreed on multiple occasions the jury could award emotional distress damages.

On at least four different occasions, Chart confirmed it had no objection to the jury awarding emotional distress damages if Plaintiffs prevailed on one or both of their strict liability claims. (2-ER-181; 3-ER-524–525; 2-SER-51, 66, 77, 87, 97.) It objected only that emotional distress damages should not be available if Plaintiffs prevailed solely on their negligence claim. (3-ER-524–525; 2-SER-51.) Even after the jury found Chart liable on all three claims and entered its verdict, Chart did not contest Plaintiffs' ability to recover emotional distress damages; its

motion for a new trial argued the emotional distress damages were excessive but did not challenge their availability. (2-SER-28, 30–34.)

Now on appeal, Chart argues for the first time that Plaintiffs cannot recover emotional distress damages under *any* of their claims. But by failing to raise that argument in the district court—and even agreeing on multiple occasions that Plaintiffs could recover emotional distress damages if they prevailed on their strict liability claims—Chart has waived its right to challenge Plaintiffs' entitlement to emotional distress damages. *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) ("an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it").

Chart maintains it preserved the issue for appeal by objecting to a verdict form that instructed jurors to enter an amount for emotional distress damages if it found Chart liable on any claim. (Appellant's Opening Br. at 49.) But the verdict forms that Chart proposed would not have resulted in a different outcome. Chart's verdict forms instruct the jury to enter an amount for emotional distress damages "if you find that Chart is liable to plaintiff under the theories of Section I—Strict Liability (Manufacturing Defect) or Section II—Strict Liability (Design Defect)." (2-SER-66, 77, 87, 97.) The jury found Chart liable under both of those theories and therefore would have awarded emotional distress damages against Chart even if Chart's objection were sustained and its preferred verdict forms given to the

jury. *See Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1028-29 (9th Cir. 2003) (finding waiver where appellants did not propose jury instructions or a verdict form that would have precluded the same result); *Vicente v. Barnett*, 415 F. App'x 767, 769 (9th Cir. 2011) (finding waiver where appellant did not object to a "verdict form that allowed for this combination of damages").

### B. The general verdict rule does not require review; the jury entered a special verdict.

Chart further argues that review is required because of the "general verdict rule." (Appellant's Opening Br. at 50.) That rule applies when a trial court instructs the jury on two or more legal theories—one of which is erroneous—and the verdict's generality makes it impossible to determine whether the jury based its finding on a permissible legal theory or on the erroneous legal theory. *United States v. $11,500.00 in United States Currency*, 869 F.3d 1062, 1068 (9th Cir. 2017). The verdict in this case contained no such generality, however. The jury made separate factual findings on each of Plaintiffs' three legal theories of recovery as well as on Chart's defense. (1-ER-35–41.) It then entered an amount of damages to reasonably compensate each plaintiff for (i) the economic value of the eggs or embryos damaged by the March 4th incident, and (ii) the emotional distress suffered as a result of the March 4th incident. (1-ER-42–43, 74–77.) Lastly, the jury assigned percentages of responsibility for Plaintiffs' harm to both Chart and Pacific Fertility Center. (1-ER-44.) This was not a general verdict at all,

but rather a special verdict where in order to enter judgment, the Court was required to determine the ultimate legal result—including by calculating the final amount of Chart's liability pursuant to California Civil Code § 1431.2. *See Zhang*, 339 F.3d at 1031 (defining special verdict); California Civil Jury Instructions (CACI) (2021) VF-1200, VF-1201, Directions for Use (referring to similar verdict forms as "special verdict forms").

Each of Plaintiffs' three alternative theories of recovery sought damages arising from the same harm and the same March 4th incident. Those damages did not depend on which theory or theories Plaintiffs prevailed on; to the contrary, the jury was instructed to enter a reasonable figure for each item of harm if it found for Plaintiffs on *any* theory. (1-ER-74.) Chart agreed that the jury could award the very same damages if the jury found for Plaintiffs on the first or second theory—and the jury did. There is accordingly no need for this Court to evaluate whether those damages could have been awarded if the jury had instead found for Plaintiffs only on the third theory. *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1426 (9th Cir. 1996) (no need to consider arguments directed toward alternative theory of liability where the jury was instructed to award damages if it found defendant liable under any theory), *aff'd,* 526 U.S. 687 (1999).

### C. Discretionary review is not warranted and would prejudice Plaintiffs.

Chart asks that the Court exercise its discretion to entertain a waived issue under the "purely legal issue exception." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1111 (9th Cir. 2020). But to do so in this case would prejudice Plaintiffs, who relied on the parties' agreement that emotional distress damages were available when deciding how to present their case to that jury. *See id.* ("the purely legal exception … should not prejudice the party that opposes the appellate court's reaching a novel issue"). Each side was limited to 25 hours of witness time, and Plaintiffs devoted a significant amount of that time to their emotional distress, deliberately choosing to emphasize that form of damages over their economic damages. They presented a reproductive psychologist to testify generally about the high degree of emotional investment that fertility patients place in their cryo-preserved eggs and embryos, and specifically about the emotional impact that the March 4th incident had on each plaintiff. (3-SER-300–301.) Much of each named plaintiffs' testimony likewise focused on their emotional reaction to the March 4th incident and the ongoing distress they have suffered as a result—and not as much on the economic value that genetically related eggs and embryos carried for each individual plaintiff. (*See, e.g.*, 3-SER-276–299 (plaintiff testimony).)

Had Chart protested the inclusion of emotional distress damages on the verdict form, and had the district court agreed that emotional distress damages were not available under any theory of recovery, Plaintiffs would have presented a very different damages case to the jury. *See Planned Parenthood*, 946 F.3d at 1111 (to exercise the purely legal exception, it must be clear a litigant could not have tried his or her case differently). Plaintiffs also would have attempted to avoid that scenario by opposing Chart's argument using evidence that is not in the record. The availability of emotional distress damages may be an issue of law, but it is one that is often context dependent. *See Merenda v. Superior Ct.*, 3 Cal. App. 4th 1, 8 (1992) ("Nowhere is the application of duty principles more heterodox than in the assemblage of cases pertaining to recovery for emotional distress."). In managing this complex proceeding over the past several years, the trial court has acquired a detailed understanding of fertility treatment and the IVF equipment industry. Had Chart contended below that it could not be held liable in strict liability for emotional distress damages, the trial court was ideally suited to address that question in context. Plaintiffs could have presented additional evidence showing that Chart was well aware its products were used by emotionally vulnerable fertility patients to safeguard their reproductive tissue: Chart markets and sells its cryogenic tanks directly to fertility clinics and considers the IVF industry a major market segment; in fact, the tank model in question is primarily sold to IVF clinics.

The availability of emotional distress damages in this particular setting is not, in other words, a purely legal issue "for which the factual record is so fully developed as to render any further development irrelevant," and therefore is a particularly poor candidate for an appellate court to decide in the first instance. *Planned Parenthood*, 946 F.3d at 1111.

## II. If the Court elects to consider the waived issue, it should affirm the jury's award of emotional distress damages.

### A. Emotional distress damages are available under Plaintiffs' strict liability claims.

Chart now claims that its own proposed verdict form was wrong and that the jury should not have been permitted to award emotional distress damages in connection with Plaintiffs' strict liability claims. It cites a number of California Supreme Court cases that considered claims for negligent infliction of emotional distress and suggests the analysis should be the same for strict liability claims. Chart points in particular to *Gu v. BMW of N. Am., LLC*, 132 Cal. App. 4th 195 (2005), for the proposition that the bystander and direct-victim liability theories "apply as well in products liability litigation." (Appellant's Opening Br. at 25.) But the only claim at issue in *Gu* was for negligent infliction of emotional distress. Other plaintiffs had brought strict liability claims to recover emotional distress damages, but their right to do so went unchallenged. That is likely because "California law clearly allows emotional distress damages in actions premised on

strict liability." *Ben-Shimol v. Trans World Airlines, Inc*., No. C-93-1586 MHP, 1996 WL 40202, at *2 (N.D. Cal. Jan. 19, 1996).

California courts have recognized that emotional distress damages are available in strict liability cases for more than four decades. In *Shepard v. Superior Ct*., 76 Cal. App. 3d 16 (1977), family members traveling in a Ford vehicle suffered mental shock and suffering when the rear door opened due to a manufacturing or design defect, leading to the death of the family's sleeping child. The California Court of Appeal found recovery for emotional injuries consistent with the underlying purpose of strict liability, which is "to relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty remedies, and thereby to insure that the costs of injuries resulting from defective products are borne by the manufacturers." *Id.* at 21 (quoting *Cronin v. J.B.E. Olson Corp*., 8 Cal. 3d 121, 133 (1972)) (cleaned up).

In *Kately v. Wilkinson*, 148 Cal. App. 3d 576, 585-86 (1983), the California Court of Appeal once again affirmed that damages for emotional trauma may be recovered through a products liability claim—even if unaccompanied by physical damages recoverable under the same claim. The driver and passenger of a defective ski boat had suffered emotional distress when the boat's steering column locked, causing it to circle uncontrollably and fatally strike the water-skier they were towing. The driver and passenger sought emotional distress damages both

through a standalone claim for negligent infliction of emotional distress and through various products liability claims. Notably, the analysis was not the same for each theory of recovery. The court found plaintiffs could not recover emotional distress damages under the negligent infliction claim. *Id.* at 579. But it reached the opposite result for the products liability claims, reasoning that the right to recover for emotional distress under those theories "depends on whether [plaintiff's] injuries were a direct result of the defective product." *Id.* at 587. The court found the driver's emotional distress was a foreseeable result of the defective steering column, and that once the complaint was amended to allege that two people were legally required to be in the boat when towing a water-skier, the passenger's emotional distress was a foreseeable result as well. *Id.* at 588-89. Both were therefore direct victims of the product defect and entitled to compensation for their injuries, whether those injuries were physical or emotional. *Id.*

The Northern District of California has applied *Shepard* and *Kately* to reject a defendant's contention that emotional distress was not compensable under a strict liability theory of recovery. *Ben-Shimol,* 1996 WL 40202 at *2-3. Like Chart, the defendant manufacturer argued a jury impermissibly awarded emotional distress damages that were unrelated to physical injury and did not involve a pre-existing relationship. *Id.* at *1. But as in *Kately*, the court found emotional distress damages were a foreseeable result and therefore compensable: "Surely a manufacturer of an

aircraft or its parts can reasonably foresee that providing defective products is likely to result in tremendous traumatic consequences for the passengers on board, including not only death and physical injury, but also emotional distress." *Id.* at *2.

The same result is called for with respect to a manufacturer of cryogenic tanks used to store eggs and embryos at fertility clinics. Chart knew its storage tanks were widely used by fertility patients to safeguard eggs and embryos that are often the patients' only way of having biological children. (2-SER-134–135; 3-SER-241–244; 4-SER-384, 402, 406–407.) It also knew that the welds in its tanks might crack, and if they do, the tank will quickly lose its ability to keep the eggs and embryos at cryogenic temperatures, creating a risk of irreversible cell damage. (3-SER-247–248; 4-SER-414, 424.) It was therefore reasonably foreseeable that a defect in the manufacturing or design of Chart's interior welds would result in significant emotional distress for the fertility patients who were depending on Chart's cryogenic tank to safeguard their reproductive material. *See also Nelson v. Superior Ct.*, 144 Cal. App. 4th 689, 696 (2006) ("the class of uses that may be foreseen by the manufacturer must necessarily be quite broad"); *Perry-Rogers v. Obasaju*, 723 N.Y.S.2d 28, 29 (N.Y. App. Div. 2001) (foreseeable that embryo mix-up would cause plaintiffs emotional distress). And when emotional distress is a reasonably foreseeable consequence of a product defect, that emotional distress is compensable through a claim for strict liability. *See Shepard* 76 Cal. App. 3d at 20-

21; *Kately*, 148 Cal. App. 3d at 588-89; *Ben-Shimol*, 1996 WL 40202 at *2. That outcome is fully consistent with the public policies underlying the strict liability doctrine, which is designed not only to ensure that manufacturers bear the costs of injuries occasioned by their products, but also to incentivize improved product safety and spread the risk of loss among all who use the product. *Nelson*, 144 Cal. App. 4th at 689; *see also Milwaukee Elec. Tool Corp. v. Superior Ct.,* 15 Cal. App. 4th 547, 556–57 (1993) ("There is no question that a manufacturer has a duty, i.e. a responsibility, to provide consumers with defect-free products; that duty underlies strict product liability.")

### B. Emotional distress damages are also available under Plaintiffs' claim for negligent failure to recall or retrofit.

In addition to asserting strict liability claims related to manufacturing and design defects in Tank 4's interior welding, Plaintiffs also asserted a claim against Chart for negligently failing to recall or retrofit Tank 4's controller. (2-SER-211–212.) Chart argued below that Plaintiffs could not recover emotional distress damages under this theory, but because Chart agreed that Plaintiffs *could* recover emotional distress damages as part of their strict liability claims, it was not necessary for the trial court to rule on Chart's objection. (2-SER-51; 3-ER-524–524) This Court need not rule on Chart's objection either if it affirms the jury's award of emotional distress damages under the strict liability theories—whether because Chart waived its argument otherwise or because California law allows for

emotional distress damages in actions premised on strict liability. But should it reach the question, the Court should find that California law also allows for the recovery of emotional distress damage on Plaintiffs' negligent-failure-to-recall claim.

California recognizes three theories of recovery for emotional distress in negligence cases: (1) parasitic damages; (2) bystander; and (3) direct victim. *Robinson v. United States*, 175 F. Supp. 2d 1215, 1224 (E.D. Cal. 2001). The bystander theory does not apply here, but Plaintiffs are permitted to recover emotional distress damages as part of their negligence claims because (i) those damages can be awarded as an item of parasitic damages; and (ii) Chart owed Plaintiffs an independent duty to recall or retrofit its controller to avoid damage to their reproductive tissue, making Plaintiffs direct victims.

### 1. Plaintiffs' emotional distress is compensable as an item of parasitic damages.

Much of the case law cited by Chart concerns standalone claims for negligent infliction of emotional distress—claims where there is no other injury and the alleged infliction of emotional distress constitutes the entire tort. *See* Dan B. Dobbs, et al*., The Law of Torts* § 383 (2d ed.). The law is different when a tort exists independent of any emotional distress. In those cases, where "the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of fictitious claims is reduced," and the judicial rationale for

limiting recovery of emotional distress damages is attenuated. *Crisci v. Sec. Ins. Co. of New Haven, Conn*., 66 Cal. 2d 425, 434 (1967). The existence of an independent injury, in effect, serves as an "assurance of the validity of the claim" for emotional distress damages. *Molien v. Kaiser Found. Hosps.*, 27 Cal. 3d 916, 926 (1980).

Most commonly, it is a physical injury that gives rise to a parasitic claim for emotional distress damages. But property damage can also suffice. As the California Supreme Court held in *Crisci*, "a plaintiff who as a result of a defendant's tortious conduct loses his property and suffers mental distress may recover not only for the pecuniary loss but also for his mental distress." 66 Cal. 2d at 433-34; *see also* California Civil Code 1431.2 (providing allocation rules for property damage actions that involve an award of emotional distress damages).

Federal courts interpreting California law have likewise concluded that "a plaintiff who loses property and suffers emotional distress can recover damages for the loss of property and emotional distress." *Amor Ministries v. Century Sur. Co*., No. 3:13-cv-01441 GPC (BGS), 2016 WL 1388077, at *11 (S.D. Cal. Apr. 7, 2016); *Dilworth v. Gen. Elec. Co*., No. 08-cv-431 WQH (JMA), 2008 WL 11337013, at *3 (S.D. Cal. July 16, 2008) ("[Plaintiffs] may be entitled to 'recover not only for pecuniary loss but also for mental distress' because the complaint

alleges that the Dilworths lost their 'property and suffer[ed] emotional distress' as a result of General Electric's tortious conduct.").

That does not mean, of course, that a plaintiff can or should be able to recover emotional distress damages for *any* type of property loss. *"Crisci* sets out the broadest form of the rule," but it is not reasonable for a jury to award emotional distress damages when "the interest invaded does not naturally entail significant emotional distress." *Merenda,* 3 Cal. App. 4th at 8. Most property can be readily repaired or replaced when damaged; so it is only with "rare exceptions," that a tort involving "simply damage to property or financial interests" will support an award of emotional distress damages. *Potter v. Firestone Tire & Rubber Co*., 6 Cal. 4th 965, 985 (1993).

Frozen eggs and embryos are not ordinary property. *Est. of Kievernagel*, 166 Cal. App. 4th 1024, 1030 (2008) ("gametic material, with its potential to produce life, is a unique type of property"). For one, unlike most property, frozen eggs and embryos cannot be repaired or replaced. (3-ER-472; 3-SER-262–266.) The trial court rejected some of Chart's proposed jury instructions on damages precisely because it agreed that Plaintiffs' eggs had no established market value and could not be replaced. (2-SER-44–51; 2-ER-76.) Chart has not contested that finding on appeal. And when property is irreplaceable, its loss will often naturally entail significant emotional distress. *See Frisina v. Women & Infants Hosp. of Rhode*

*Island,* No. CIV. A. 95-4037, 2002 WL 1288784, at *10 (R.I. Super. May 30, 2002) (loss of irreplaceable property in the form of pre-embryos justified recovery of emotional distress damages under Rhode Island law); *Windeler v. Scheers Jewelers*, 8 Cal. App. 3d 844, 852 (1970) (emotional distress damages were recoverable following defendant's negligent loss of irreplaceable family heirloom).

Frozen eggs and embryos also represent far more than just a simple property interest— they represent the potential for human life, the preservation of Plaintiffs' reproductive options, and an opportunity for Plaintiffs to have biological children in the future when they otherwise could not. When Chart's cryogenic storage tank failed and Plaintiffs lost their eggs and embryos, they didn't just lose property; they lost the option to conceive and raise biological children using genetic tissue that they had undertaken great effort to preserve. Each plaintiff testified about the dramatic impact that loss of reproductive opportunities has had on their life and how it continues to cause them severe anguish. (*See* Statement of the Case, Section B, *supra*.) The plaintiffs' accounts were further substantiated by an expert in reproductive psychology who testified how intense the desire to have biological children can be and how psychologically devastating it is to lose that opportunity. (3-SER-301–306.) "The legal academy has also documented the significant emotional stress that routinely accompanies [IVF and other assisted reproductive technology] procedures." *Witt v. Yale-New Haven Hosp.*, 977 A.2d 779, 786

(Conn. Super. Ct. 2008) (collecting publications). And jurisdictions outside of California have likewise recognized that the loss of reproductive opportunities causes severe emotional harm. *See id.* at 793 (negligent disposal of ovarian tissue caused couple to "suffer the emotional distress attending their lost potential to conceive a child together"); *Perry-Rogers*, 723 N.Y.S.2d at 29 (negligent implantation of embryo into another woman caused emotional harm by depriving couple of "the opportunity of experiencing pregnancy, prenatal bonding, and the birth of their child").

California courts have not squarely addressed the issue, but the guidance provided through existing case law strongly suggests that they too would recognize that emotional distress damages are recoverable under a parasitic damages theory when reproductive tissue is negligently damaged or destroyed. Plaintiffs did not suffer "simply damage to property or financial interests," and their emotional distress does not arise "solely out of property damage." *Potter*, 6 Cal. 4th at 985; *Erlich v. Menezes*, 21 Cal. 4th 543, 554 (1999). Plaintiffs' reproductive futures were forever altered by the March 4th incident; they lost not only a property interest in their frozen tissue, but the opportunity to use that tissue to have future biological children. *See Holliday v. Jones*, 215 Cal. App. 3d 102, 117-18 (1989) (emotional distress damages are available when negligent legal representation affects a liberty interest and not merely a property interest). The emotional distress

fertility patients suffer when they lose the opportunity for biological children is well-documented and precisely the sort of "emotional distress which could be said naturally to ensue from an act which invaded an interest protected by an established tort." *Merenda*, 3 Cal. App. 4th at 9 (collecting "diversity of circumstances" in which recovery for emotional distress has been explicitly permitted). Similarly, the irreversible damage Plaintiffs' eggs and embryos suffered as a result of the March 4th incident—along with the accompanying impact on Plaintiffs' reproductive options—provides the "guarantee of genuineness" that California courts have looked for when deciding whether emotional distress should be recoverable in a negligence action. *Potter*, 6 Cal. 4th at 986.

> **2.      Plaintiffs' emotional distress is compensable under the direct victim theory because Chart owed them a legal duty to recall or retrofit the cryogenic tank that stored their eggs and embryos.**

Under the "direct victim" theory, emotional distress damages are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff that is (i) assumed by the defendant, (ii) imposed on the defendant as a matter of law, or (iii) arises out of a relationship between the plaintiff and defendant. *Burgess v. Superior Ct.*, 2 Cal. 4th 1064, 1073 (1992); *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 590 (1989).

Here, Plaintiffs' emotional distress resulted from Chart's breach of a duty imposed by law: a manufacturer's duty to recall or retrofit a product after it learns the product poses a serious risk of harm. *See Lunghi v. Clark Equip. Co.*, 153 Cal. App. 3d 485, 494 (1984) ("[Manufacturer's] knowledge of the injuries caused by [mechanical design] features imposed a duty to warn of the danger, and/or a duty to conduct an adequate retrofit campaign."); *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1828 (1994) ("[Manufacturer] breached its duty to conduct an adequate retrofit campaign");

Chart acknowledged below that California imposes a duty to recall or retrofit when post-sale knowledge puts a manufacturer on notice regarding a dangerous product defect (2-SER-39.) The jury found that Chart did in fact learn that Tank 4's controller was likely to be dangerous when used in a reasonably foreseeable manner. (1-ER-40.) And as the trial court confirmed post-trial, that post-sale knowledge gave rise to a duty of care as a matter of law. (1-ER-4 (citing *Lunghi*, 153 Cal. App.3d at 494).) Chart does not contest that conclusion on appeal. Nor does Chart contest the jury's finding that it breached its duty of care by failing to recall or retrofit Tank 4's controller when a reasonable manufacturer would have done so. (*See* 1-ER-40–41.) Chart challenges only the jury's ability to compensate Plaintiffs for their emotional distress upon finding that Chart's failure to recall caused damage to Plaintiffs' eggs and embryos. But under California's direct

victim theory, emotional distress damages are indeed recoverable when they result from a duty imposed on a defendant by law. *Burgess*, 2 Cal. 4th at 1073; *Marlene F.*, 48 Cal. 3d at 590; *see also Taylor v. Honeywell Int'l, Inc.,* 599 F. App'x 664, 665 (9th Cir. 2015) (affirming award of emotional distress damages where "[t]he district court concluded that [Manufacturer] owed Mark a duty, and [Manufacturer] does not contest that conclusion on appeal").

Chart likens Plaintiffs to the husband in *Justus v. Atchison*, who was not permitted to recover emotional distress damages under a bystander theory when he observed "certain disturbing developments in the delivery room." *Justus*, 19 Cal. 3d 564, 585 (1977). The difference here is that Plaintiffs are not seeking compensation for their emotional distress under a bystander theory, but rather under a direct-victim theory based on the breach of a legal duty owed to them by Chart. Husbands who witness a stillbirth can point to no such legal duty, as an attending physician owes no duty of care to a patient's spouse in California. The patient herself is, however, entitled to recover emotional distress damages arising from the very same incident because she is owed a legal duty of care. *Burgess*, 2 Cal. 4th at 1069; *Zavala v. Arce*, 58 Cal. App. 4th 915, 932–33 (1997). Eligibility to recover emotional distress damages under a direct victim theory is, as Chart itself puts it, "a question of duty." (Appellant's Opening Br. at 23.) In *Justus*, the husband was owed no duty and could not recover emotional distress damages. The

wife was owed a duty and so could. And in *Huggins*, neither parent was owed a duty by their child's pharmacist and so neither parent could recover emotional distress damages. *Huggins v. Longs Drug Stores California, Inc*., 6 Cal. 4th 124, 132 (1993). Here, all Plaintiffs were owed a duty of care by Chart as a matter of law. Chart does not say otherwise and does not seek to overturn the jury's finding that Chart breached that duty. Under the direct-victim theory of recovery, Plaintiffs are therefore permitted to recover all damages proximately caused by that negligence—including emotional distress damages. *Burgess*, 2 Cal. 4th at 1074.

## III. The district court properly excluded Miller's test and controller readings from 2013 and 2014.

### A. Miller's tank test was not sufficiently similar and too unreliable to present to the jury.

Plaintiffs presented evidence, including expert testimony from Dr. Anand Kasbekar, that a cracked weld on the inside of Tank 4 caused it to lose liquid nitrogen overnight in the 22 hours between when the lab closed on March 3rd and when the tank failure was discovered on March 4th. 2-ER-358. Chart's expert, Franklin Miller, conducted a test that purported to "disprove[] Dr. Kasbekar's conclusions" and rebut claims that Tank 4 had been adequately filled with liquid nitrogen the day before it imploded. In Miller's opinion, 14 inches of liquid nitrogen could not have boiled off in the 22-hour period and PFC employees

therefore must have let the liquid nitrogen levels inside the tank deplete over the course of several weeks. (2-SER-195.)

On March 19, 2021, the district court excluded Miller's tank testing after concluding that it was not sufficiently similar to the Tank 4 incident and too unreliable. (2-ER-229.) While Miller's test used a tank identical in appearance to Tank 4 and recreated some of the conditions surrounding Tank 4's failure, his testing differed in several significant aspects. Miller's test did not account for the volume of tissue and IVF equipment inside Tank 4 even though, due to displacement, this would have affected the amount of liquid nitrogen inside Tank 4. (2-ER-227–228, 243; 2-SER-112.) Miller's test also simulated an *exterior* crack in the tank when Plaintiffs contended that the tank failed due to an *interior* weld crack. (2-ER-228; 2-SER-168, 186.) Further compounding these problems, Miller performed his test only once. (2-ER-228.) The district court therefore rejected Chart's argument that his test was "sufficiently similar" to the conditions of the Tank 4 incident and concluded that when evaluated in its totality, his testing was too unreliable under *Daubert* to be presented to the jury. (2-ER-228–229.)

Chart moved for reconsideration, as well as clarification as to whether Miller was precluded from testifying to his visual observations from his exemplar testing. On April 30, 2021, the district court denied the motion because "[n]othing in the motion . . . gives the Court a reason to revisit this holding." (2-ER-160.) The court

excluded Miller's visual observations from his test for the same reasons but permitted him to testify based on his experience about "what one would expect to see on the outside of a cryogenic tank following a vacuum failure." (*Id.*) The court subsequently allowed an illustrative photograph from Miller's test to be used at trial. (2-SER-53–55.)

After the jury returned its verdict, Chart moved for a new trial, arguing that it was prejudiced by the district court's evidentiary rulings, including its decision to exclude Miller's tank testing. (2-SER-29.) On November 8, 2021, the district court denied Chart's motion for a new trial. (1-ER-16.)

### 1. The substantial similarity standard applies to Miller's test.

A district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

The district court did not err in applying the substantial similarity standard to Miller's tank testing. *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (orders excluding expert testimony are reviewed for abuse of discretion). This Court has applied the substantial similarity standard in products liability cases in the context of determining the admissibility of prior accidents to establish the existence or notice of a design defect. *See Tompkins v. Medtronic, Inc.*, 17 F.3d 396 (9th Cir. 1994). Other Circuits, too, have adopted the substantial

similarity standard to determine the admissibility of expert testing or demonstrations in products liability cases. *See, e.g., McKnight By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1401 (8th Cir. 1994).

Under this standard, "[a] court may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions." *Id.* at 1401 (emphasis and citation omitted). An expert may perform tests or experiments to establish a scientific principle, but "if the evidence is offered to merely show physical principles, the experiment should be conducted without suggesting that it simulates actual events." *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir. 1992). Experiments or demonstrations "must not be misleading in and of themselves, and one such way that a demonstration might mislead is when, as here, the demonstration resembles the disputed accident. Indeed, it is this resemblance which gives rise to the requirement of substantial similarity." *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006).

> **2.    The district court applied the correct legal standard because Miller's test replicated key aspects of the Tank 4 incident and thus may have misled the jury.**

Arguing that the district court "misunderstood" that Miller's test was an illustration and not a recreation, Chart insists that if an expert's test serves only to illustrate a scientific principle, it is admissible "as long as the test was properly

conducted" regardless of whether the test presents a risk of confusing the jury. Appellant's Opening Br. at 21, 54. The key question for determining the admissibility of an expert's test, however, is "whether the demonstration is sufficiently close in appearance to the original accident to create the risk of misunderstanding by the jury[.]" *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993). Thus, the district court did not apply the wrong legal standard; rather, it correctly recognized that by replicating many of the test conditions and using the same model tank, Miller's test was so similar in appearance to the Tank 4 incident that it created a risk of misleading the jury.

Chart's insistence that the sole purpose of Miller's test was to demonstrate a basic scientific principle to the jury is inconsistent with the record. Miller's own report stated that his test "simulated performance with full vacuum failure." (2-SER-183.) Chart stressed that Miller's testing was relevant for "refuting that Tank 4 had a full vacuum seal failure and could have actually lost LN2 as quickly as Plaintiffs theory[.]" (2-SER-122, 195.) As Chart intended to use the testing to directly challenge Plaintiffs' version of what occurred, the district court correctly identified a significant risk of jury confusion. *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (where issues "are foreign to the average juror," the risk of jury confusion is especially acute where the evidence "would

have been presented in a format resembling a recreation of the event that caused the accident").

While Chart now reframes Miller's test as an experiment to illustrate scientific principles, it fails to recognize that "the critical point is not one of labels" but whether there is a risk of confusing the jury. *Fusco*, 11 F.3d at 264; *see Gilbert v. Cosco Inc.*, 989 F.2d 399, 402-03 (10th Cir. 1993) ( "[t]he more blurred that distinction [between illustration and reconstruction] becomes, the greater the risk for prejudice" if a test is admitted without sufficient similarity to the incident at issue) (citation omitted). Miller's tank testing blurred the lines between an illustration and recreation of the incident: (1) he used the exact same model of tank as Tank 4, (2-SER-172, 183); (2) he induced vacuum failure (2-SER-184); and (3) he let the tank sit for the same amount of time between Tank 4's last fill measurement and discovery of the tank failure (2-SER-184).

Other courts have upheld the exclusion of expert experiments under similar circumstances. *See, e.g.*, *Four Corners Helicopters*, 979 F.2d at 1442 (rejecting argument that experiment simulating some accident conditions was only "offered to illustrate general physical and scientific principles); *see also Muth*, 461 F.3d at 567 ("Ford characterized the CRIS test as essentially depicting Ford's theory of the accident, all the while maintaining that it was offered, not as a reenactment, but only to show general scientific principles.").

Chart's argument that the substantial similarity requirement does not apply to tests performed to illustrate a scientific principle is belied by the very same authorities it relies on. (Appellant's Opening Br. at 53-54 (citing, *inter alia*, *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 278-79 (1st Cir. 2002).) In *Jodoin*, the First Circuit explained that "we look to whether the evidence 'is sufficiently close in appearance to the original accident to create the risk of misunderstanding by the jury, for it is that risk that gives rise to the special requirement to show similar conditions.'" 284 F.3d at 278-79 (quoting *Fusco*, 11 F.3d at 264). The *Jodoin* court held that substantial similarity was required, because "a jury would likely view the testing as a reconstruction of the actual accident, not as simply illustrative of scientific principles." *Id.*; *see also McKnight*, 36 F.3d at 1402-03 (rejecting argument that battery test was not required to satisfy the substantial similarity requirement because it was not limited to demonstrating scientific principle but "to explain what probably happened during the accident"). Here, too, Miller's experiment was designed to explain what—in Chart's view—"probably happened" to Tank 4: that PFC employees failed to adequately monitor the tank and allowed it to run dry. (Appellant's Opening Br. at 53-54.) As such, regardless of whether the test was a recreation or an illustration, there was a significant risk that the jury would confuse his test with an accurate recreation of the incident.

None of the other cases on which Chart relies suggests the district court erred in excluding Miller's testing which "too closely resembles the disputed accident to effectively present abstract principles without misleading the jury." *Muth*, 461 F.3d at 566. By contrast, in Chart's cases, the experiments were sufficiently dissimilar from the underlying accident that they posed little risk of creating a misleading impression to the jury. *See Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1278 (7th Cir. 1988); *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987); *Pandit v. Am. Honda Motor Co.*, 82 F.3d 376, 381 (10th Cir. 1996). Chart also relies on a district court decision in *Voohries-Larson v. Cessna Aircraft Company*, but that case is in accord with the district court's decision because the court agreed that "[i]f the experiment is admitted merely to show physical principles, the experiment should not suggest that it simulates actual events[.]" 177 F.R.D. 462, 467 (D. Ariz. 1998).

Because Miller's test is "'sufficiently close in appearance to the original accident to create the risk of misunderstanding by the jury'" the district court did not err in requiring Chart to demonstrate that Miller's tank testing was sufficiently similar to the conditions of the Tank 4 incident to be admissible. *See Jodoin*, 284 F.3d at 278-79 (citation omitted).

### 3. Miller's test was neither substantially similar nor sufficiently reliable.

The district court did not abuse its discretion when it concluded that Miller's test was not sufficiently similar to Tank 4 and failed to pass muster under *Daubert*.

The district court heard extensive oral argument regarding boil-off rates and the visual appearance of the tank. (2-SER-124–130.) The court then carefully considered the issues with a particular focus on how much the volume of liquid nitrogen in Miller's tank differed from the volume of liquid nitrogen in Tank 4. (2-SER-129–130.) When the court issued its written decision, it found that Miller (1) did not account for the material and equipment inside Tank 4 or the resulting difference in volume and (2) only simulated an exterior breach in an effort to disprove Plaintiffs' case even though Plaintiffs posited an interior breach. (2-ER-228.) The court concluded that these two deficiencies meant that Miller's testing failed to "fit the facts of the case" and was therefore not "relevant to the task at hand." (*Id.* (citing *Daubert*, 509 U.S. at 591, 597).) In addition, Miller's decision to perform his test only once—when taken together with the two other issues—rendered his test too unreliable. (2-ER-228–229.)

Chart argues that Miller explained during his deposition that the volume would have "made no scientific difference." Appellant's Opening Br. at 60. The district court was not persuaded by this cursory statement because Miller did not provide any support for it in his report and did not further elaborate during his

deposition. (2-ER-228.) According to Chart, Miller's bare assertion was nevertheless not *ipse dixit* because Miller later cited a research study submitted by Plaintiffs' counsel supporting his position. In fact, that study—concerning evaporation rates in cryogenic storage tanks after a vacuum failure—found that the volume inside of the tank *does* significantly affect the evaporation rate, as the same model tank filled with equipment had an evaporation rate more than four times greater than the same tank without such equipment inside. (2-ER-205–206.) This is consistent with Chart's own in-house cryogenic engineer's report, which states that "as the liquid level decreases in the tank, the rate of level change increases due to the displacement of the liquid nitrogen by the volume of the sample vials stored in Tank 4." (2-SER-215–216.)

Regardless of whether the research paper supported Miller's opinion, Chart leaves out that Miller did not cite the paper until he submitted a declaration with Chart's *reply in support of its motion for reconsideration*. (Appellant's Opening Br. at 60 (citing 2-ER-167–169).) Even if the research paper supported Miller's opinion, Chart cannot now complain that the district court failed to consider it in excluding Miller's tank testing, as a motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier." *Wells Fargo Bank, N.A. v. Mahogany*

*Meadows Ave. Tr.*, 979 F.3d 1209, 1218 (9th Cir. 2020) (citation and emphasis omitted).

Chart further faults the district court for deciding "whether the storage boxes affected the boiloff rate" claiming that the question should have been left for the jury to decide. (Appellant's Opening Br. at 61.) However, Plaintiffs demonstrated that Miller's exemplar tank contained about 25-30% more liquid nitrogen than Tank 4, and Miller's position that the volume inside the tank was irrelevant to his boiloff calculations was inconsistent with the conclusions of Chart's own cryogenic expert. (2-SER-112, 216.) The district court therefore did not abuse its discretion in refusing to abdicate its gatekeeping role by requiring Miller to provide a sufficient foundation for his opinion that the volume inside the tank "made no scientific difference." *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014) (district court must "avoid delegating" its gatekeeping role "to the jury") (en banc), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc).

The district court also found that Miller's test was irrelevant because while he sought to disprove Plaintiffs version of the events, he only tested an external breach while Plaintiffs posited that some of the liquid nitrogen escaped into the vacuum space through an internal vacuum breach—the cracked weld. Chart never addressed this difference in its opposition to Plaintiffs' *Daubert* motion and

provided no evidence that the distinction was immaterial for testing purposes. (2-ER-228.) Chart itself recognized that the two types of breaches would produce different results, noting that an interior weld failure would likely cause "an inner vessel implosion, total vacuum loss," while an exterior breach was likely to result in a less severe failure. (4-SER-414–415 (compare DEW-3 and DEW-4 to DEW-6).) Chart now falls back on its argument that the district court erroneously applied the substantial similarity test. (Appellant's Opening Br. at 62.) As discussed above, the district court did not err in requiring Chart to show substantial similarity. *See Jodoin*, 284 F.3d at 279.

Arguing that the district court "misconstrued the importance of error rates," Chart maintains that the district court erred by excluding Miller's test "simply because Miller performed the test once." (Appellant's Opening Br. at 63-65.) This mischaracterizes the court's ruling which cited not only his inability to determine the rate of error but also his failure to account for the higher volume of liquid nitrogen and decision not to simulate an interior leak. (2-ER-228–229.) In its brief, Chart asserts that Miller's testing had no error rate because "[t]here is no right or wrong answer to the question [of] how fast liquid nitrogen evaporates from a cryogenic tank" but this assertion is devoid of any support from the record and should be rejected. (*See* Appellant's Opening Br. at 64.) Had he repeated the test, Miller was likely to find variations in the boil-off rates as his own notes showed

that the boil-off rate varied considerably throughout his tests. (2-SER-113–120.)

Further, his measurements were of dubious accuracy because he relied almost

entirely on the tank's controller, which did not give precise measurements and

often understated the amount of liquid nitrogen in the tank. (Id.; 2-SER-186.)

Because there were serious questions regarding the reliability of the data obtained

from the testing—as well as failure to account for the volume inside the tank and to

simulate an interior breach—it was especially important for Miller to subject his

methods to repeat testing. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir.

2004) (affirming exclusion of expert opinion based on "a blanket statement"

without "any error rate associated with it"). His failure to do so rendered his tank

testing too unreliable to present to the jury, and the district court did not err in

excluding it.

### 4.    Chart was not prejudiced by any error.

According to Chart, Miller's test should have been admitted to demonstrate

both the evaporation rate of liquid nitrogen following a vacuum loss and the

external tank appearance that PFC employees should have observed if Plaintiffs

theory of the incident was correct. (Appellant's Opening Br. at 57.) The district

court, however, allowed Chart to accomplish these purposes through other

testimony. Any error in disallowing the exemplar test was therefore not prejudicial

because it was cumulative of testimony that was presented to the jury. *See Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1460 (9th Cir. 1983).

As Chart notes, Miller testified based on his "years of experience" that it was impossible for the amount of liquid nitrogen to evaporate in 22 hours as Plaintiffs claimed. (Appellant's Opening Br. at 17; 3-ER-504–505.) Miller further testified that in his opinion, the fastest a tank like Tank 4 could lose 14 inches of liquid nitrogen in the event of a cracked interior weld was "[a]bout 30 hours." (3-SER-347.) Miller also testified that it was not possible for 122 liters of liquid nitrogen in the tank to evaporate in twenty-two hours. (3-SER-315–318.) In other words, Chart was able to present evidence directly challenging Plaintiffs' theory of what occurred. *See Haddad*, 720 F.2d at 1456.

Miller was also allowed to testify regarding what one would expect to see on the outside of a tank with vacuum failure. He explained to the jury that one of the first visible signs is "a 2-foot long conical shaped plume coming out of the vent path from the device[.]" (3-SER-311.) He also testified that he would expect frost to form at the vent path "something like a frost ball. Looks like snow." (3-SER-312.) And he testified that "You will start to see condensation form on the outside of the tank" and "as the condensation forms, it runs down the side and starts to run across the floor." (3-SER-313–314.)

The district court even allowed Chart to use a photograph taken during Miller's test as a demonstrative to the jury. (2-SER-53–55.) The photo illustrated how a cryogenic tank that loses vacuum insulation will display condensation on the outside of the tank, which may then pool on the floor.



(2-SER-56.)

Accepting Chart's representation that Miller's testing was meant to illustrate scientific principles only, it suffered no prejudice because it was able to accomplish the same goal with other admissible testimony and evidence.

**B.** **The district court properly excluded evidence regarding past liquid nitrogen levels in Tank 4.**

    **1.** **The district court excludes the years-old readings under Rule 404(b).**

Tank 4 was equipped with a controller that measured the level of liquid nitrogen inside the tank and kept a log of those measurements. As Chart admits, Tank 4's controller had previously malfunctioned, reporting liquid nitrogen levels and temperature inaccurately. (Appellant's Opening Br. at 10.) The evidence also showed that the controller model could report liquid nitrogen levels lower than actually present. (2-SER-186, 194.) The logs that were pulled from the faulty controller on Tank 4 contained low-level readings that were recorded between July 2013 and January 2014, including two instances where the controller recorded a liquid nitrogen level of zero inches. (2-ER-100; 2-SER-193.) Chart's experts intended to opine based on the faulty controller's logs that there was a "history of neglect" at PFC long before March 2018. (2-ER-100; 2-SER-193–195.)

Plaintiffs moved to exclude these expert opinions and reference to the 2013 and 2014 readings under Rule 404 as prior bad acts that were inadmissible. (2-SER-153–154, 162.) The district court granted Plaintiffs' motion and excluded this evidence under Rule 404(b) because the 2013 and 2014 readings were "too attenuated to be probative." (2-ER-224–225, 229; *see* 2-ER-160 9.)

During trial, PFC embryologist Erin Fisher testified that she had never personally observed low liquid nitrogen levels in Tank 4 or any other tanks in the lab prior to March 4, 2018, (3-ER-470), and Dr. Conaghan testified that "I believe [Tank 4] never dropped below six inches" prior to March 4, 2018. (3-ER-420.) Instead of trying to lay a foundation that they were creating a false impression about their awareness of the readings, Chart opted to wait an entire week before attempting to introduce the 2013-14 controller log evidence. Rejecting Chart's argument that PFC staff opened the door, the district court explained that Ms. Fisher and Dr. Conaghan's testimony was not inconsistent with the 2013-14 readings because the questions they were responding to were limited to their awareness, and Chart "d[id]n't have any evidence that they were aware" of the controller's low level readings (or any other indication that the level of liquid nitrogen in the tank was ever *actually* low before 2018). (3-ER-479.).

The district court reaffirmed its ruling post-trial. (1-ER-9–10 (citing *United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007)).)

## 2. The 2013-14 readings were properly excluded

Chart does not challenge the district court's decision to exclude the 2013-14 readings before trial under Rule 404(b). (*See* Appellant's Opening Br. at 69-71.) Chart has thus waived challenging that aspect of the district court's ruling. *See McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 876 (9th Cir. 2011);

*Montana Sulphur & Chem. Co. v. U.S. E.P.A.*, 666 F.3d 1174, 1187 n.4 (9th Cir. 2012).

Chart focuses its argument on whether the district court abused its discretion by denying it the chance to use the 2013-14 controller readings to impeach the testimony of PFC witnesses. (Appellant's Opening Br. at 69-71.) Impeachment by contradiction requires that the evidence "'meaningfully contradict[ ]'—or be inconsistent with—a witness's testimony." *Primus v. Target Corp.*, 532 F. App'x 314, 315 (3d Cir. 2013) (citation omitted). "To contradict is to prove a fact contrary to what has been asserted by a witness." *United States v. Tracey*, 675 F.2d 433, 440 (1st Cir. 1982).

In denying Chart's motion for a new trial, the district court correctly explained that the testimony of these PFC witnesses did not create a false impression because Chart failed to lay a foundation that they were aware of the 2013-14 readings. (1-ER-10; *see Sine*, 493 F.3d at 1037 (witnesses' "limited testimony was insufficient to open the door to the government's otherwise impermissible references to [inadmissible evidence], as [the defendant] did not introduce an inaccurate portrait" of the evidence).) The 2013-14 controller readings did not contradict Fischer and Dr. Conaghan's testimony because they did not testify that there were never any prior low liquid nitrogen events with Tank 4. (3-ER-420, 470.) Testimony that is at most ambiguous, but not necessarily

contradictory, is insufficient to permit the introduction of otherwise inadmissible evidence. *See, e.g.*, *United States v. Miller*, 738 F.3d 361, 377 (D.C. Cir. 2013) (district court did not abuse its discretion in prohibiting line of questioning on cross-examination where "any contradiction would have been ambiguous"); *United States v. Kowallek*, 438 F. App'x 889, 891 (11th Cir. 2011) (similar).

At bottom, Chart wanted to introduce the 2013-14 controller readings as substantive evidence to establish "that PFC's failsafe procedures for keeping the tank full had failed before." (Appellant's Opening Br. at 71.) "Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible." *United States v. Gilbert*, 57 F.3d 709, 711 (9th Cir. 1995). Chart does not challenge the district court's conclusion at the outset that the readings were inadmissible under Rule 404(b) and has not shown that the testimony created a false impression to the jury. Thus, the district court committed no error in refusing to allow Chart to introduce the 2013-14 controller readings during trial. *See Sine*, 493 F.3d at 1037 ("the 'opening the door' doctrine is not so capacious as to allow the admission of any evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence"); *Ilyia v. Khoury*, 671 F. App'x 510, 511 (9th Cir. 2016) (similar).

### 3. Chart was not prejudiced by the exclusion of the 2013-14 readings.

"A party seeking reversal for evidentiary error must show that the error was prejudicial, and that the verdict was more probably than not affected as a result." *Boyd v. City & Cty. of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009) (quotation marks and citation omitted). Even if the district court should have allowed evidence of the 2013-14 low-level readings, the omission did not taint the verdict in this case because "the evidence at trial strongly supported the judgment." *See Brown v. Sierra Nevada Mem'l Miners Hosp.*, 849 F.2d 1186, 1190 (9th Cir. 1988).

It was unlikely that the 2013-14 low-level readings would have affected the verdict in Chart's favor because Plaintiffs would have introduced evidence that the readings were inaccurate. There was no dispute at trial that Tank 4's controller had malfunctioned, causing it to read liquid nitrogen levels and temperature inaccurately. (Appellant's Opening Br. at 10; 3-SER-372.)

The 2013-14 readings also tend to *undermine* rather than buttress Miller's theory that Tank 4 imploded in 2018 because PFC allowed it to run dry. If the readings were accurate, then Tank 4 had previously run dry on multiple occasions, (2-ER-100), but never imploded as Miller claimed it would (3-ER-509–512; *see also* 3-SER-331–332, 338 (describing tank buckling). The jury could infer that simply running out of liquid nitrogen is not enough to cause a total tank implosion

as Chart argued. Alternatively, if the jury credited Miller's theory, it could have inferred from the lack of a 2013-14 implosion that the low-level readings were not accurate.

Finally, even if the district court should have allowed Chart's counsel to impeach Fisher and Dr. Conaghan with the 2013-14 readings, it is unlikely this would have changed the jury's overall assessment of their credibility. In Chart's closing argument, its counsel touted the fact that, by his count, he had impeached these PFC witnesses "15-18 times" in one day and that Dr. Conaghan and other PFC witnesses "went up there on that stand and lied and lied and lied." (3-SER-379 .) Chart's case thus required the jury to disbelieve the PFC witnesses and find instead that they were "lying to you" on the stand when they testified Tank 4 was kept full of liquid nitrogen on the days leading up to its implosion. (*See* 3-ER-1895.) In reaching a verdict against Chart, the jury must have found the PFC witnesses to be credible, and in view of the significant evidence in the record, it is implausible that one more supposedly inconsistent statement—offered without foundation—would have tipped the scales. *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 887 (10th Cir. 2006) (any error was harmless where "the jury unequivocally rejected" the defendant's version of the facts).

## CONCLUSION

For the foregoing reasons, the judgment entered by the district court should be affirmed.

Dated: October 14, 2022        Respectfully submitted,

       /s/ Amy M. Zeman

Eric H. Gibbs
Amy M. Zeman
GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Dena C. Sharp
Adam E. Polk
Nina R. Gliozzo
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

Adam B. Wolf
Tracey B. Cowan
PEIFFER WOLF CARR KANE CONWAY
& WISE, LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-17016

I am the attorney or self-represented party.

**This brief contains** | 13,975 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Amy M. Zeman     **Date** | 10/14/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*